2012 COA 162

In re the Parental Responsibilities
of M.W., a Child,

and

Concerning Shane Jonas Taylor,
Petitioner–Appellant,

and

Trista Ann Wamsher, Respondent–
Appellee,

and

Edward Day, Intervenor–Appellee.

No. 12CA0771.

Colorado Court of Appeals,
Div. V.

Sept. 27, 2012.

Springer and Steinberg, P.C., Michael P. Zwiebel, Denver, Colorado, for Petitioner–Appellant.

Pearson & Paris, P.C., Nathan T. Mattison, Lakewood, Colorado, for Respondent–Appellee.

McGuane and Hogan, LLP, Kathleen A. Hogan, Denver, Colorado, for Intervenor–Appellee.

The Radman Law Firm, LLC, Diane R. Radman, Denver, Colorado, for Amici Curiae National Center for Lesbian Rights and Lambda Legal Defense and Education Fund, Inc.

Opinion by Judge HAWTHORNE.

¶ 1 In this action concerning parental responsibilities for M.W., who is the child of Trista Ann Wamsher (mother) and Edward Day (father), mother's former boyfriend, Shane Jonas Taylor, appeals from the trial court's. judgment. The trial court determined that, although Taylor has standing under section 14–10–123(1)(c), C.R.S.2012, it could not allocate parental responsibilities to him consistent with *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). We reverse and remand for further proceedings.

## I. Factual and Procedural History

### A. Mother and Taylor's Relationship

¶ 2 Mother and Taylor entered into a relationship while mother was pregnant with father's child. Taylor was present when M.W. was born and lived with mother and M.W. for the first two years of M.W.'s life. During this time, Taylor participated with mother in M.W.'s daily care, and also cared for the child by himself on several occasions when mother was away overnight. Mother considered Taylor as effectively M.W.'s father. Mother also encouraged M.W. to identify Taylor as his father, and M.W. did so.

¶ 3 When M.W. was two years old, mother and Taylor ended their relationship, and mother and M.W. moved out of Taylor's home. Several months later, Taylor petitioned for an allocation of parental responsibilities for M.W.

## B. Father's Involvement

¶ 4 After mother moved out of Taylor's home, she sought public assistance, which resulted in father, who was living in North Carolina at the time, being notified that a child support action had been initiated against him. Father initially doubted that he was M.W.'s father and had had no contact with mother or M.W. Several years later, in the course of a child support proceeding, he arranged for genetic testing, and his paternity was confirmed. Thereafter, father intervened in the parental responsibility proceeding initiated by Taylor, and moved to Colorado with his girlfriend. With mother's consent, father and his girlfriend then began exercising parenting time with M.W.

## C. Trial Court Proceedings

¶ 5 The trial court held a three-day hearing at which numerous witnesses, including a parental responsibilities evaluator (PRE), testified concerning the parties, their relationships and interactions with M.W., and M.W.'s best interests.

¶ 6 The PRE recommended that Taylor, as M.W.'s psychological parent, be the child's primary caregiver. A clinical psychologist, who evaluated the parties, testified that Taylor was very motivated to continue being a loving parent to M.W., that father had just recently met M.W. for the first time, and that mother did not understand M.W.'s need for predictability and routine in terms of who was taking care of him.

¶ 7 Mother testified that although she recognized Taylor as a father to M.W., it was in M.W.'s best interests for her to be the child's primary parent. Mother further testified that M.W. was enjoying his parenting time with father and referred to both Taylor and father as "daddy."

¶ 8 Father testified that he appreciated Taylor's role in helping mother care for M.W., but that the child now had both biological parents in his life, and that father and mother were co-parenting successfully and should be able to continue doing so.

¶ 9 The trial court found that although Taylor was M.W.'s psychological parent and had established standing under section 14–10–123(1)(c), the court could not allocate parenting time to Taylor unless it found that mother and father were unfit or that they would likely make parenting decisions that were not in M.W.'s best interests. Because, based on the evidence presented, the court did not find either of these two elements, it further found that it could not legally allocate parenting time to Taylor over M.W.'s parents' objections. After Taylor's C.R.C.P. 59 motion was denied by the trial court, he appealed.

## II. Legal Standard

¶ 10 Taylor contends that the trial court applied an incorrect legal standard by ruling that it could not allocate parenting time to him unless it found that mother and father were unfit or that they would likely make parenting decisions that were not in M.W.'s best interests. We agree.

¶ 11 We review de novo the legal standard applied by the trial court in a parental responsibility dispute between a parent and a nonparent. *See In re Parental Responsibilities of B.R.D.*, 2012 COA 63, ¶ 15, 280 P.3d 78.

### A. Parental Responsibilities Proceedings Involving Nonparents

¶ 12 Once a nonparent has established standing under section 14–10–123(1), C.R.S. 2012, to pursue an allocation of parental responsibilities for a child, the trial court then considers whether to allocate parenting time or decision-making authority to the nonparent based on the factors in section 14–10–124(1.5), C.R.S.2012. *In re Parental Responsibilities of B.J.*, 242 P.3d 1128, 1132 (Colo.2010).

¶ 13 A parental responsibilities dispute between a parent and a nonparent is not a contest between equals, however. *See B.R.D.*, ¶ 28; *In Interest of C.T.G.*, 179 P.3d 213, 218 (Colo.App.2007); *In Interest of E.L.M.C.*, 100 P.3d 546, 561 (Colo.App.2004). Rather, parents have a fundamental right protected by the Due Process Clause to make decisions concerning the care, custody, and control of their children. *Troxel*, 530 U.S. at 66, 120 S.Ct. 2054; *B.J.*, 242 P.3d at

1133. Thus, before a court can allocate parental responsibilities to a nonparent over a child's parent's objections, special factors must justify the court's interference with the parent's fundamental right. *See B.J.*, 242 P.3d at 1134.

■ ¶ 14 Further, when a nonparent seeks parental responsibilities for a child contrary to a parent's wishes, the court is required to give special weight to a parent's determination whether to grant the requested responsibilities. *See id.* Giving special weight means that the presumption favoring the parent's decision can be rebutted only by clear and convincing evidence that granting parental responsibilities to the nonparent is in the child's best interests. *See id.; In re Parental Responsibilities of E.S.*, 264 P.3d 623, 626–27 (Colo.App.2011). A nonparent need not also prove that the child's parents are unfit, however. *See In re Parental Responsibilities of Reese*, 227 P.3d 900, 905 (Colo.App.2010); *cf. In re Adoption of C.A.*, 137 P.3d 318, 326 (Colo.2006) (rejecting standard that would require grandparents to demonstrate parental unfitness in order to be awarded visitation over the parents' objections).

■ ¶ 15 In allocation of parental responsibilities proceedings, the court must employ a three-part test before issuing an order granting a nonparent's request for parental responsibilities. *See B.J.*, 242 P.3d at 1134; *Reese*, 227 P.3d at 903. First, a presumption exists favoring the parental determination. *B.J.*, 242 P.3d at 1134. Second, to rebut this presumption, the nonparent must show by clear and convincing evidence that the parental determination is not in the child's best interests. *Id.* Finally, the ultimate burden rests on the nonparent to establish by clear and convincing evidence that the nonparent's requested allocation is in the child's best interests. *Id.* After applying this test, a court allocating parental responsibilities to a nonparent must make factual findings and legal conclusions identifying those "special factors" on which it relies. *Id.*

### B. Best Interests

■ ¶ 16 When determining whether to allocate parental responsibilities to a nonparent under these standards, a court must consider the section 14–10–124(1.5) factors, giving paramount consideration to the physical, mental, and emotional conditions and needs of the child. *B.J.*, 242 P.3d at 1134; *see also* § 14–10–123.4, C.R.S.2012 ("[C]hildren have certain rights in the determination of matters relating to parental responsibilities, including the right to have such determinations based upon the best interests of the child."); *In re Custody of C.C.R.S.*, 892 P.2d 246, 248 (Colo. 1995) ("[T]he best interests of the child standard is the paramount consideration in a custodial dispute between a natural parent and the psychological parents.").

### C. The Trial Court's Ruling

■ ¶ 17 Here, the trial court did not apply these standards. It concluded that, although Taylor had standing under section 14–10–123(1)(c), the constitutional determination established in *Troxel* "trumps the Colorado statute,"[1] and therefore the court *could not* allocate parenting time to Taylor over mother's and father's objections unless it found that the parents were unfit or were likely to make decisions that were not in M.W.'s best interests.

¶ 18 In so ruling, the trial court relied on the following statement from *Troxel*:

> [S]o long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to

---

**1.** We do not read the trial court's use of the phrase "the [c]onstitutional determination delineated above trumps the Colorado statute" as a declaration that section 14–10–124(1.5) is unconstitutional. Such a reading would deprive us of jurisdiction over the appeal under section 13–4–102(1)(b), C.R.S.2012 (the court of appeals does not have initial jurisdiction over appeals from final judgments of district courts in cases in which a statute has been declared unconstitutional). Rather, we understand the trial court to

have concluded, based in part on decisions of divisions of this court, that section 14–10–124(1.5) must be construed in light of the constitutional holding in *Troxel. See Reese*, 227 P.3d 900; *C.T.G.*, 179 P.3d 213. We agree with the trial court in this regard, but disagree with its application of the principles set forth in those decisions and *Troxel*, as most recently articulated by the Colorado Supreme Court in *B.J.*, to the facts of this case.

inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children.

530 U.S. at 68–69, 120 S.Ct. 2054; *see also B.J.*, 242 P.3d at 1135 ("Whether to allow any daytime or overnight visits, and if so, under what circumstances, is typically a parent's decision to make.").

¶ 19 Here, however, the trial court found, with record support, the existence of unique circumstances involving the parties and their relationships and interactions with M.W., including: (1) Taylor was a psychological parent for M.W.; (2) mother encouraged M.W. to identify Taylor as a parent for the first two years of the child's life, and M.W. believed that Taylor was his father; (3) Taylor provided as much or more of M.W.'s care than mother did during this time; (4) father was completely absent from the child's life and had just met the child shortly before the hearing; and (5) the PRE recommended that Taylor, not M.W.'s parents, should have primary parental responsibilities.

¶ 20 Thus, although, as the trial court found, mother and father were fit parents, the situation they created for M.W. was unusual, and not indicative of a normal parent-child relationship in which intervention into the private family realm cannot be justified under *Troxel.*

¶ 21 When a nonparent is involved in a child's life to the degree that he or she becomes a psychological parent and meets the strict standing requirements under section 14–10–123(1), a court *may* intervene, without violating *Troxel*, and determine, after according special weight to the parent's determination, whether it is in the child's best interests to allocate parental responsibilities to the nonparent. *See E.L.M.C.*, 100 P.3d at 561–62 (noting the existence of special factors justifying interference with the mother's parental right, including that the mother permitted and encouraged her domestic partner to participate in raising the child, and the child recognized both parties as her parents); *see also Broussard–Scher v. Legendre,* 60 So.3d 1290, 1296–98 (La.Ct.App.2011) (situation where third party provides significant

care for a child is extraordinary circumstance not commonly associated with raising a child, and thus provides a sufficient basis under *Troxel* for the court to intervene and determine whether third party visitation is in the child's best interests); *cf. Troxel,* 530 U.S. at 68, 120 S.Ct. 2054 (order imposing grandparent visitation was *not* founded on any special factors to justify interference with parent's fundamental right).

¶ 22 Thus, under the circumstances involved here, we conclude that the trial court erred by finding that it could not allocate parental responsibilities to Taylor, and by failing to determine, under section 14–10–124(1.5), whether it would be in M.W.'s best interests to do so.

¶ 23 We are not persuaded otherwise by mother's argument that the trial court adequately considered M.W.'s best interests under section 14–10–124(1.5) by finding that the evidence did not establish that mother and father would likely make decisions that were *not* in M.W.'s best interests. We agree with Taylor that the court's consideration of whether the parents would likely make decisions contrary to M.W.'s best interests is tantamount to considering whether the parents are fit. *See Troxel,* 530 U.S. at 68, 120 S.Ct. 2054 (fit parents are presumed to act in their children's best interests).

¶ 24 The statute requires, however, that the court determine parental responsibilities in accordance with the child's best interests, considering *all* relevant factors, including those listed at subsections (1.5)(a) and (b). *See* § 14–10–124(1.5); *Reese,* 227 P.3d at 902. Although whether mother and father are fit, or whether they generally make decisions in M.W.'s best interests, is relevant to this inquiry, it is not a dispositive or conclusive factor in determining whether it would be in M.W.'s best interests to allocate parental responsibilities to Taylor. *See C.C.R.S.,* 892 P.2d at 256–57 (child's best interests and not parental fitness is controlling factor when awarding custody between parents and nonparent); *Reese,* 227 P.3d at 905 (parental unfitness need not be established in order to overcome parental presumption and allocate parental responsibilities to nonparent). Thus, we do not agree that the court ade-

quately complied with section 14–10–124(1.5) merely by finding that mother and father are not likely to make decisions contrary to M.W.'s best interests.

¶ 25 We are also not persuaded otherwise by the trial court's statement, in the order denying Taylor's C.R.C.P. 59 motion, that it properly applied the facts to the law, including the best interests of the child standard. Contrary to the court's statement, the court did not make any findings concerning whether (1) the parents' parental responsibilities determination was in M.W.'s best interests, (2) Taylor had rebutted that determination by clear and convincing evidence, or (3) Taylor had established that it was in M.W.'s best interests to have parenting time with him. Rather, the court erroneously ruled that it *could not* make those required findings.

¶ 26 On remand, the trial court should apply the relevant statutory factors and determine whether it would be in M.W.'s best interests to allocate parental responsibilities to Taylor. In doing so, the court must (1) begin with a presumption favoring mother's and father's parental responsibilities determination; (2) determine whether Taylor rebutted this presumption by clear and convincing evidence that the parents' determination is not in M.W.'s best interests; and then (3) place the ultimate burden on Taylor to establish by clear and convincing evidence that allocating parental responsibilities to him would be in M.W.'s best interests. *See B.J.,* 242 P.3d at 1132; *see also B.R.D.,* ¶ 25. If, after applying this test, the court grants Taylor parental responsibilities, it must make factual findings and legal conclusions identifying those special factors on which it relies. *B.J.,* 242 P.3d at 1132.

¶ 27 We recognize, however, that M.W.'s circumstances may have changed since the trial court entered judgment in this case, and that the court must determine M.W.'s best interests based on his circumstances existing at the time of remand proceedings. *See In re Marriage of Miller,* 670 P.2d 819, 820–21 (Colo.App.1983). Thus, although on remand, the court may rely on the existing record in determining M.W.'s best interests, it must also provide the parties the opportunity to present additional evidence concerning M.W.'s current circumstances. *See B.R.D.,* ¶ 43. The existing parental responsibility allocation shall remain in effect pending new orders by the trial court. *See id.* at ¶ 47.

¶ 28 Contrary to the parents' argument, however, Taylor's status as M.W.'s psychological parent is not only significant in determining Taylor's standing under section 14–10–123(1), but is also relevant in determining M.W.'s best interests on remand. *See* § 14–10–124(1.5)(a)(III), C.R.S.2012 (court must consider the interaction and interrelationship of the child with the parents and with any other person who may significantly affect the child's best interests); *cf. C.A.,* 137 P.3d at 326–27 (rejecting grandparent visitation standard requiring showing of parental unfitness because it did not sufficiently take into account the bond of care and affection that had developed between the grandparents and child).

¶ 29 Although we remand the case for reconsideration of Taylor's petition under the standards set forth above, we address certain additional issues raised by the parties because they are likely to arise on remand.

### III. Father's Parental Presumption

¶ 30 Taylor further contends that because father was not involved in M.W.'s life until shortly before the hearing, father is not entitled to a parental presumption, or alternatively, if he is entitled to a presumption, that Taylor need only rebut the presumption by a preponderance of the evidence. We disagree.

¶ 31 The trial court found that although father initially doubted that he was M.W.'s father, after his paternity was confirmed, he intervened in the parental responsibilities action, and moved permanently to Colorado to begin actively participating in M.W.'s care. Accordingly, the court found that father was a fit parent.

¶ 32 Taylor relies on *Lehr v. Robertson,* 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), in which the Court held that a child's father, who was absent from the child's life and had not entered his name on New York's putative father registry when adoption pro-

ceedings began as to the child, was not entitled to notice or an opportunity to be heard in the proceedings. *Lehr* was decided many years before *Troxel* and did not address the issue involved here, where father had, by the time of the parental responsibilities hearing, come forward to actively participate in raising M.W., and was found by the trial court to be a fit parent. *See Troxel*, 530 U.S. at 68–69, 120 S.Ct. 2054 (according parental presumption to "fit" parents); *Lehr*, 463 U.S. at 261, 103 S.Ct. 2985 (when an unwed father demonstrates a full commitment to the responsibilities of parenthood by coming forward to participate in rearing the child, his interest gains constitutional protection); *see also People in Interest of A.M.K.*, 68 P.3d 563, 564–66 (Colo.App.2003) (according parental presumption to biological father who had only sporadic contact with child).

¶ 33 We also reject Taylor's contention that father is entitled to only a weaker presumption, and that Taylor may rebut father's presumption by a preponderance of the evidence, as opposed to by clear and convincing evidence. Taylor relies for this contention on *In Interest of D.I.S.*, 249 P.3d 775 (Colo. 2011), in which our supreme court held that parents who voluntarily placed their child in guardianship with relatives were not in the same position as custodial parents, and thus the guardians had the burden to establish by only a preponderance of the evidence that terminating the guardianship was not in the child's best interests. *See id.* at 786; *see also B.R.D.*, ¶ 36 (applying preponderance of the evidence standard when parents consented to an order vesting nonparents with sole decision-making authority and primary residential custody); *cf. E.S.*, 264 P.3d at 627 (clear and convincing standard applies when parent only temporarily transferred care of child and nonparent petitioned for parental responsibilities rather than moving to terminate the temporary guardianship).

¶ 34 Father here is not in a similar situation to the parents in *D.I.S.* and *B.R.D.*, who made conscious decisions to formally transfer primary care of and authority over their child to third parties. Thus, we do not view *D.I.S.* as controlling the standard of proof here. On remand, the trial court should accord a parental presumption to both mother and father consistent with *Troxel*.

## IV. Rights of Psychological Parents

¶ 35 Taylor suggests that we should recognize a constitutional right for him, as M.W.'s psychological parent, and that under the facts here, Taylor's constitutional right should take precedence over father's rights. We decline to address this argument because Taylor concedes that it is not necessary to resolve this appeal.

¶ 36 We do not address any of the amici's arguments not also raised by the parties. *See Beaver Creek Prop. Owners Ass'n v. Bachelor Gulch Metro. Dist.*, 271 P.3d 578, 585 (Colo.App.2011) (declining to address issue raised by amicus but not by the parties).

## V. Attorney Fees

¶ 37 Mother requests her attorney fees incurred on appeal under section 14–10–119, C.R.S.2012, contending that her financial resources are limited as compared to Taylor's resources. Because the trial court is better equipped to determine issues of fact regarding the parties' current financial resources, we remand mother's request to the trial court. *See* C.A.R. 39.5; *In re Marriage of Williamson*, 205 P.3d 538, 543 (Colo.App. 2009).

¶ 38 The judgment is reversed and the case is remanded for further proceedings as provided herein.

Judge LOEB and Judge MILLER concur.