2013 COA 170

**IN RE the PARENTAL RESPONSIBILITIES OF A.R.L., a Child,**

and

**Concerning Elizabeth Limberis, Appellant,**

and

**Sabrina Havens, Appellee.**

**Court of Appeals No. 13CA0342**

Colorado Court of Appeals,
Div. IV.

Announced December 5, 2013

Logan County District Court Nos. 11DR107 & 12JV42, Honorable Charles M. Hobbs, Judge

Willoughby & Associates, Kimberly R. Willoughby, Leslie Hansen, Denver, Colorado, for Appellant.

Bauer & Furman, PC, Steven M. Furman, Fort Morgan, Colorado, for Appellee.

Opinion by JUDGE DUNN

¶ 1 Can a child have a biological mother and a presumptive mother under the Colorado Uniform Parentage Act, sections 19–4–101 to –130, C.R.S.2013 (UPA)? The trial court implicitly answered this question "no," when it denied Elizabeth Limberis' petition for maternity for A.R.L., a child conceived during Limberis' relationship with her former partner, Sabrina Havens. Thus, the trial court did not consider and determine whether Limberis was the child's presumed mother under the UPA.

¶ 2 We conclude that, in the context of a same-sex relationship, a child may have two mothers under the UPA—a biological mother and a presumptive mother. We therefore reverse the trial court's denial of Limberis' petition for maternity and remand for a determination of her petition on the merits.

### I. Background

¶ 3 Limberis and Havens began living together in 2000. Several years into their relationship, Havens and Limberis decided to have a child. Havens underwent one round of artificial insemination, but did not conceive.

¶ 4 After this failed attempt, Havens' friend, Marc Bolt, agreed to inseminate her through sexual intercourse. Neither Havens nor Bolt revealed their sexual encounter to Limberis. Havens later conceived.

¶ 5 Havens gave birth to A.R.L. in 2008.[1] Limberis was present at A.R.L.'s birth. She and Havens agreed to give the child Limberis' last name. A.R.L.'s birth certificate identifies Havens as A.R.L.'s mother, but does not identify a father.

¶ 6 Havens, Limberis, and A.R.L. lived in Limberis' home, and together the couple parented A.R.L. Beginning in 2009, however, Limberis and Havens went through a series of separations and reconciliations. Although Havens initially had primary care of A.R.L., Limberis gradually began exercising regular parenting time. Eventually, she and Havens shared equal parenting time for A.R.L.

¶ 7 In 2010, Limberis petitioned for a second-parent adoption of A.R.L. Havens consented to the petition, representing to the court that A.R.L. was conceived through assisted reproduction, and had no other parent. The court ultimately dismissed the adoption petition. Limberis did not appeal that ruling.

¶ 8 In 2011, Limberis and Havens separated for the last time, and Limberis filed a petition for parental responsibilities under section 14–10–123(1), C.R.S.2013. After their separation, Havens and Limberis continued to co-parent. Eventually, however, Havens terminated all contact between Limberis and A.R.L.

¶ 9 Havens contested Limberis' request for allocation of parental responsibilities and joined Bolt as a party. Bolt responded, describing himself as a sperm donor. He later filed a petition to relinquish his parental rights. In his relinquishment counseling interview, Bolt confirmed that he was not part of A.R.L.'s life and did not want to be.

¶ 10 Limberis then petitioned for maternity under the UPA. She alleged, among other things, that because she had received A.R.L. into her home and held A.R.L. out as her own, she was a presumed parent under the UPA. *See* § 19–4–105(1)(d), C.R.S.2013 (the holding out provision). Attached to her petition was Bolt's sworn "admission of nonpaternity," in which he confirmed that he (1) is not A.R.L.'s legal parent; (2) never intended

to be A.R.L.'s legal parent; (3) only acted as a sperm donor; (4) did not wish to claim any legal rights to A.R.L.; (5) always understood that Limberis and Havens would be A.R.L.'s natural parents; and (6) did not object to an adjudication of Limberis as A.R.L.'s mother.

¶ 11 Havens moved to dismiss Limberis' maternity petition for failure to state a claim upon which relief could be granted. Havens argued that because A.R.L. had a father and a mother, Limberis could not be a second mother and third parent under the UPA. The trial court summarily dismissed Limberis' petition "for the reasons set forth in the motion to dismiss." Limberis moved for reconsideration, arguing, as relevant here, that she had the capacity to bring a maternity claim under the UPA, and that she could present evidence that she was A.R.L.'s presumptive parent under the UPA's holding out provision.

¶ 12 The trial court consolidated the parental responsibilities proceedings with the maternity proceedings and held a hearing. The court stated it would also consider Limberis' motion for reconsideration. After the hearing, the court denied Limberis' maternity petition on the basis that the case did not present a surrogacy or sperm donor situation. Rather, the court explained that because A.R.L. had two biological parents, it was "not willing to create a new legal category." As a result, the court did not determine whether Limberis had presented sufficient evidence to establish that she is A.R.L.'s presumptive mother. The court then allocated all parental responsibilities to Havens, based primarily on the testimony and report of the child and family investigator.

¶ 13 Twelve days later, the court granted Bolt's petition to relinquish his parental rights, leaving A.R.L. with only one legal parent.

¶ 14 Limberis appeals the trial court's denial of her maternity petition, and the order allocating parental responsibilities entirely to Havens.

---

1. A.R.L.'s birth predates the Colorado Civil Union Act, sections 14–15–101 to –119, C.R.S.2013. The Act provides that parties to a civil union shall have the same rights, under the UPA, regarding children as if they were spouses. *See* § 14–15–107(6), C.R.S.2013.

## II. Limberis' Maternity Petition

¶ 15 Limberis contends that the trial court erred in denying her maternity petition on legal grounds, without considering the merits of the petition. We agree.

### A. Standard of Review

¶ 16 Whether Limberis may bring a maternity petition under the UPA as a second legal mother to A.R.L. is an issue of statutory interpretation that we review de novo. *See In re Parental Responsibilities of M.D.E.*, 2013 COA 13, ¶ 9, 297 P.3d 1058; *cf. In Interest of S.N.V.*, 284 P.3d 147, 149 (Colo. App.2011) (conducting de novo review of trial court's decision that biological father's wife did not have the legal capacity to seek a declaration of maternity under the UPA).

### B. Capacity or Standing to Bring a Maternity Action

¶ 17 Under the UPA, "[a]ny interested party may bring an action to determine the existence or nonexistence of a mother and child relationship." § 19–4–122, C.R.S. 2013. Limberis alleged facts in her maternity petition that, taken as true, demonstrate that she is an interested party. Havens does not contest that Limberis is an interested party. Accordingly, to the extent the trial court's denial of Limberis' petition was based on a conclusion that Limberis lacked capacity to bring an action under the UPA, we disagree. *See S.N.V.*, 284 P.3d at 149 (holding that child's biological father's wife had the capacity as an interested party under the UPA to bring a maternity action).

### C. Presumptive Parentage Under the UPA

¶ 18 The purpose of the UPA is to establish and protect the parent-child relationship. *See id.* at 150. The UPA extends the parent-child relationship to all children equally, regardless of the parents' marital status. § 19–4–103, C.R.S.2013. And at the heart of any parentage decision is the child's best interests. *See People In Interest of C.L.S.*, 313 P.3d 662, 666–68, 2011 WL 5865898 (Colo.App. No. 10CA1980, Nov. 23, 2011).

¶ 19 The parent-child relationship includes the mother and child relationship and the father and child relationship. § 19–4–102, C.R.S.2013. The UPA does not define the parent-child relationship based only on biological or adoptive connections to a child. *N.A.H. v. S.L.S.*, 9 P.3d 354, 360–62 (Colo. 2000) (recognizing that biology is not conclusive in establishing parentage under UPA); *see also Lehr v. Robertson*, 463 U.S. 248, 261–62, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983) (approving state law requiring more than existence of a mere biological link to establish parentage). To the contrary, the UPA reflects the legislature's intent to allow a man or woman to prove paternity or maternity based upon considerations other than biology or adoption. *See* § 19–4–105, C.R.S.2013 (parent-child relationship may be demonstrated by, among other things, marriage, a written acknowledgment of paternity, consent to be named on the birth certificate, a promise to pay child support, or receiving the child into one's home and holding the child out as a natural child); *see also* § 19–4–104, C.R.S.2013 (recognizing that parent-child relationship may be established by "any other proof specified in this article" and based on proof other than adoption or natural birth). Thus, the determination of parentage is not limited to genetics. Depending upon the evidence presented, a person may be a presumed parent without being a biological or adoptive parent. *E.g., In re Parental Responsibilities of A.D.*, 240 P.3d 488, 491 (Colo.App.2010) (affirming finding of presumptive parentage of nonbiological father and rejecting argument that under the UPA a biological or adoptive relationship is required to establish parent-child relationship).

¶ 20 Under the UPA's holding out provision, a man is presumed to be the father of a child if "he receives the child into his home and openly holds out the child as his natural child." § 19–4–105(1)(d). And while most of the reported decisions focus on presumed fathers, the holding out provision applies with equal force to women seeking to demonstrate presumptive mother status. *See* § 19–4–122 (the provisions of this article applicable to determine the father and child relationship also apply, when practicable, to determine the existence of a mother and child relation-

ship); § 19–4–125, C.R.S.2013 ("In case of a maternity suit against a purported mother, where appropriate in the context, the word 'father' shall mean 'mother.'"); *see also S.N.V.*, 284 P.3d at 149 (noting that under the UPA, the terms "mother" and "father" are interchangeable, and therefore, paternity presumptions apply equally to petitions for maternity).

¶ 21 A division of this court has considered whether a biological mother's parentage claim conclusively precluded a parallel claim by the biological father's wife. *S.N.V.*, 284 P.3d 147. There, the wife alleged that she and her husband had entered into a surrogacy agreement with the child's biological mother. *Id.* at 149–51. The wife petitioned for status as the child's natural mother under the UPA over the objection of the biological mother. *Id.* The division concluded that the wife could maintain a claim as a presumptive mother, and in doing so found that a woman may gain status as a child's legal mother even if she has no biological ties to the child. *Id.* at 151 (proof that a woman received a child into her home and held the child out as her own may establish the mother-child relationship). The division thus confirmed that presumptive parenthood applies equally to men and women. *Id.*

¶ 22 Even so, Havens argues that *S.N.V.* does not stand for the proposition that a child can have two legal mothers under the UPA, and she further contends a child cannot. She specifically asserts that the trial court correctly dismissed Limberis' maternity petition because (1) when it dismissed the petition, Bolt was A.R.L.'s biological father, and a child cannot have three legal parents; and (2) a court may not substitute a second legal mother in place of a child's biological father. We reject both assertions in turn.

1.  There Are Not Three Legal Parents

■  ¶ 23 Relying on the purported biological connection between Bolt and A.R.L., Havens argues that granting Limberis' maternity petition would have impermissibly left

A.R.L. with three legal parents. We reject this argument for five reasons.

¶ 24 First, based on the facts presented here, Bolt was, at most, an alleged father. The record contains no blood or other genetic tests that verify his supposed biological link to A.R.L. While Havens and Bolt assume that Bolt is the biological father, a statutory presumption of biological paternity requires more. § 19–4–105(1)(f), C.R.S.2013 (a presumption of paternity is established if genetic tests indicate that the alleged father's probability of parentage is ninety-seven percent or higher); *see also N.A.H.*, 9 P.3d at 360 (a man is entitled to biological presumption if genetic testing reveals that he is the biological father). Accordingly, Bolt was not entitled to the statutory presumption of biological paternity.

¶ 25 Second, no other statutory presumptions apply. Bolt did not marry or try to marry Havens, he is not identified as A.R.L.'s parent on her birth certificate, he did not acknowledge paternity in any writing filed with the court, he did not offer to pay child support, he did not hold A.R.L. out as his own, and he did not adopt A.R.L. *See* §§ 19–4–104, 19–4–105(1)(a)(d), C.R.S.2013. Thus, Bolt was not entitled to a non-biological presumption of paternity.

¶ 26 Third, suppose that Bolt could be A.R.L.'s presumed legal father based on the belief that he is the biological father. Even so, that presumption is rebuttable. § 19–4–105 (biology is one of many rebuttable presumptions of parentage); *see also N.A.H.*, 9 P.3d at 360–62 (biology is not a conclusive presumption of parentage). And Bolt presented unequivocal evidence to rebut it.[2] In contrast, nothing was presented to support the presumption that Bolt is A.R.L.'s legal father. Nor was evidence presented to rebut Limberis' maternity petition in which she alleged that she took A.R.L. into her home and held A.R.L. out as her own child. *See id.; see also A.D.*, 240 P.3d at 491 (mere existence of purported biological father, who did not claim paternity, did not raise a con-

---

2.  The trial court recognized the weight of evidence rebutting the presumption that Bolt was A.R.L.'s legal parent. Indeed, the court acknowledged that "Bolt had no relationship to the child; made no financial support; offered no emotional support; did not acknowledge the child as his own; [and] did not in any way, shape, or form, act as a parent to the child."

flicting paternity presumption to rebut presumed father's claim under the holding out provision).[3]

¶ 27 Fourth, suppose that Bolt actually filed a petition for parentage based on his alleged biological connection with A.R.L. So too did Limberis, based on her allegations under the UPA's holding out provision. This would not create a possibility of three legal parents. Rather, there would be two competing petitions for parentage based on different presumptions. When confronted with competing petitions, the trial court determines which presumed parent prevails based on the weightier considerations of policy and logic and the child's best interests. *N.A.H.*, 9 P.3d at 359–65.

¶ 28 Fifth, and finally, three people were never vying to be A.R.L.'s legal parents. Bolt never claimed paternity. Rather, he denied his paternity and filed a petition to relinquish his parental rights. Neither Limberis nor Havens contested Bolt's renunciation of paternity. Nor did anyone request that the trial court adjudicate Bolt a legal parent. In light of this record, the court was never faced with three parentage claims or the possibility of finding the existence of three legal parents.[4]

¶ 29 Accordingly, the trial court erred in dismissing Limberis' petition for maternity based on its conclusion that A.R.L. already had two "biological parents."

### 2. Limberis Did Not Seek to Substitute Herself in Place of Bolt

¶ 30 In the alternative, Havens argues that there is no authority in Colorado to support substituting a second legal mother for a child's legal father. This assertion again hinges on the assumption that Bolt was A.R.L.'s legal father, an assumption which the evidence does not support.

¶ 31 In any event, Limberis did not seek to "substitute" herself in place of Bolt. Even ascribing some biological presumption to Bolt, the trial court was faced with, at most, two competing presumptions to consider. *E.g.*, *N.A.H.*, 9 P.3d at 359 (considering competing presumptions of paternity). The trial court was not asked to substitute a presumptive parent for a legal parent.

¶ 32 Havens' substitution argument therefore does not present a basis to support the trial court's denial of Limberis' maternity petition.

### D. A Child May Have Two Legal Mothers Under the UPA

¶ 33 Underlying Havens' arguments and the trial court's ruling is the implicit premise that a child may not have two legal mothers under the UPA. We disagree.

¶ 34 Nothing in the UPA prohibits a child from having two same-sex parents. Rather, the plain language of the UPA is gender-neutral and specifically allows the terms "father" and "mother" to be used interchangeably, where practicable. § 19–4–125. Had the legislature intended to limit parentage to one female and one male, it could have done so. *See In re Marriage of Hartley*, 886 P.2d 665, 673 (Colo.1994) (if the legislature intended a statute to include a provision, it would have expressly included the provision). It did not. We will not engraft such a limitation into the statute. *See Scoggins v. Unigard Ins. Co.*, 869 P.2d 202, 205 (Colo.1994) ("We will not judicially legislate by reading a

---

3. Havens essentially asks us to conclude that a biological connection to a child is a conclusive presumption of parentage; not a rebuttable presumption. In addition to being contrary to precedent of our supreme court, Havens' argument permits the existence of an uninterested biological father to preclude a child from the benefit of a loving, nurturing relationship with a willing presumed mother. It is hard to see how a court could find such a result consistent with a child's best interests. *See People in Interest of C.L.S.*, 313 P.3d 662, 671, 2011 WL 5865898 (Colo.App. No. 10CA1980, Nov. 23, 2011) (interpreting UPA in light of child's best interests).

4. Nor do we share Havens' concern, expressed at oral argument, that allowing Limberis to present evidence that she is a presumptive mother will open the door to unending claims of parentage by any person remotely involved in a child's life. A presumed parent is someone who demonstrates an enduring commitment to a child and can present evidence of a familial relationship with a child. *See* § 19–4–105(1)(d). It is not a showing that a casual friend, a fond relative, or even a parent's significant other can necessarily satisfy.

statute to accomplish something the plain language does not suggest, warrant or mandate.").[5]

¶ 35 This interpretation is supported not just by the language of the UPA, but also by the compelling interest children have in the love, care, and support of two parents, rather than one, whenever possible.[6] *See Elisa B. v. Superior Court*, 37 Cal.4th 108, 33 Cal. Rptr.3d 46, 117 P.3d 660, 669 (2005) (there is value in children having two parents, rather than one, as a source of both financial and emotional support); *accord Frazier v. Goudschaal*, 296 Kan. 730, 295 P.3d 542, 557–58 (2013). The prerogative of a child to claim the love and support of two parents does not evaporate simply because the parents are the same sex. It applies to all children, regardless of whether they were conceived during a heterosexual or same-sex relationship. Thus, we conclude that a child who is born during a same-sex relationship can have two legal parents of the same sex, if the nonbiological parent can demonstrate presumptive parenthood under the UPA.

¶ 36 Recognizing that a child can have two legal mothers under the UPA—though new to Colorado—is consistent with other jurisdictions' interpretations of similar UPA provisions. *See, e.g., Elisa B.*, 33 Cal.Rptr.3d 46, 117 P.3d at 670 (woman was a presumed second mother to twins born to her same-sex partner during the parties' relationship where she had received the children into her home and openly held them out as her own); *St. Mary v. Damon*, —— Nev. ——, 309 P.3d 1027 (2013) (holding that Nevada Parentage Act and its policies do not preclude a child born to a same-sex couple from having two legal mothers); *Frazier*, 295 P.3d at 553 (woman who was in a same-sex relationship with a child's biological mother "can make a

colorable claim to being a presumptive mother of [the] child without claiming to be the biological or adoptive mother."); *Chatterjee v. King*, 280 P.3d 283, 285–89, 292 (2012) (finding that a former same-sex partner could assert a claim as a second mother to the other partner's adoptive child based on the holding out provision); *see also Smith v. Gordon*, 968 A.2d 1 (Del.2009) (under the holding out provision, lesbian partner of a woman who adopted a child could petition for legal parent-child relationship).[7]

¶ 37 Against these interpretations, Havens proposes construing the UPA based upon a person's gender. That is, where a biological mother exists, another woman could not seek to be a presumptive mother. But a man, or more than one man, could seek presumptive father status. So, here, if Elizabeth Limberis was instead Eric Limberis, under Havens' interpretation, there would be no barrier to him seeking presumptive parent status notwithstanding Bolt's alleged biological connection to A.R.L. Such a construction treats presumptive parents differently based on their gender, thus raising equal protection concerns. *See* Nancy D. Polikoff, *Response: And Baby Makes ... How Many? Using In re M.C. to Consider Parentage of a Child Conceived Through Sexual Intercourse and Born to a Lesbian Couple*, 100 Geo. L.J. 2015, 2031 (2012) (a gender-neutral reading of the UPA's holding out provision may prevent creating an unconstitutional gender-based classification). We will not construe a statute in a manner that invites questions about its constitutionality. *See Comm. for Better Health Care for All Colo. Citizens v. Meyer*, 830 P.2d 884, 894 (Colo.1992) (statutory terms are to be construed in a manner that avoids potential constitutional infirmities).

---

5. To be sure, some states have enacted versions of the UPA that limit those who may establish parentage by eliminating provisions that allow for certain presumptions of paternity. *See, e.g.,* Mo.Ann.Stat. § 210.822 (2013) (omitting the presumption of paternity available for holding a child out as one's own). Colorado did not so limit its holding out provision.

6. In denying Limberis' maternity petition, the court left A.R.L. with only one legal parent.

7. *Michael H. v. Gerald D.* does not change our analysis. 491 U.S. 110, 131, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989). In that case, the Supreme Court concluded a child could not have two fathers in light of a California statute establishing a "conclusive presumption" of legitimacy to a birth mother's husband. *Id.* at 119–20, 109 S.Ct. 2333. That case involved a conclusive parentage presumption that is not at issue here. And it did not involve a holding out provision. Thus, it is inapposite.

¶ 38 Havens further argues that article II, section 31 of the Colorado Constitution, which defines marriage as a union between one man and one woman, indicates a preference for Colorado children to have one mother and one father, rather than two parents of the same sex. This provision, however, did not modify the UPA or Colorado's parentage laws, which are different from its marriage laws. Indeed, the definition of marriage in the constitution says nothing about parentage or who may become a presumptive parent under the UPA. And the UPA expressly does not require parents to be married to establish a parent-child relationship. *See* § 19–4–103 (parent-child relationship extends equally to all children regardless of the marital status of the parents). We therefore do not agree that article II, section 31 of the Colorado Constitution bars Limberis' petition for maternity.[8]

¶ 39 We also reject Havens' argument that Limberis may not be a presumptive second mother because A.R.L. was conceived through sexual intercourse rather than through artificial insemination. The holding out provision does not address method of conception. *See* § 19–4–105(1)(d). And nothing in that provision limits its application to those children conceived only through artificial reproduction. *See id.* Had the legislature intended to limit the holding out provision to children conceived only through artificial insemination, it would have done so, as it expressly did in another provision of the UPA. *See* 19–4–106(9), C.R.S.2013 (expressly excluding application of section to a child "conceived by means of sexual intercourse"); *see also Sinclair Mktg. Inc. v. City of Commerce City*, 226 P.3d 1239, 1243 (Colo. App.2009) (it is presumed that the legislature acts intentionally when it includes particular language in one section of a statute but omits it in another). Because the legislature did not limit the holding out provision to children conceived through artificial insemination, neither will we. *See In re N.B.*, 199 P.3d 16, 20 (Colo.App.2007) (court may not create an exception to a statute when the

legislature has not done so). Thus, A.R.L.'s method of conception does not limit Limberis' ability to establish that she is A.R.L.'s presumptive mother.

¶ 40 In sum, we hold that in the context of a same-sex relationship, a child may have two legal mothers under the UPA. Whether Limberis satisfies the statutory criteria to be a presumptive mother, however, is a distinctly factual question properly resolved by the trial court. *See S.N.V.*, 284 P.3d at 151 (directing the district court to determine the mother and child relationship). Because the trial court denied Limberis' maternity petition on legal grounds, it never considered the merits of her petition, and thus must do so on remand.

### III. Alternative Contentions

¶ 41 Limberis raises two alternative contentions, in the event that she does not prevail on her argument that she may bring a maternity petition under the UPA. First, she contends that the trial court erred in not adopting a common law "de facto parent" theory. Second, she contends that the trial court abused its discretion in allocating parental responsibilities entirely to Havens. Because we conclude that the trial court erred in denying Limberis' maternity petition, we do not reach these arguments.

### IV. Conclusion

¶ 42 Nothing in the UPA limits a parent's fundamental liberty interest in the care, custody, and control of their children to heterosexual parents. Nor does the UPA strip a child of the right to a loving, nurturing parent-child relationship because the child was conceived during a same-sex relationship. Accordingly, parentage determinations under the UPA are not based on the sexual orientation of the parents.

¶ 43 Because we conclude that in the context of a same-sex relationship a child may have two mothers—a biological mother and a presumed mother—we reverse the trial court's order denying Limberis' maternity

---

8. Nothing in this opinion should be read as expressing a view upon the constitutionality of article II, section 31 of the Colorado Constitution.

petition. On remand, the trial court is instructed to determine whether Limberis is A.R.L.'s presumptive mother under the UPA's holding out provision, section 19–4–105(1)(d).

¶ 44 If the court determines that Limberis is A.R.L.'s presumptive mother, it must then enter appropriate orders regarding, among other things, the duty of child support, and the allocation of parental responsibilities. *See* §§ 19–4–116(3), 14–10–124(1.5), C.R.S. 2013. In this regard, the best interests of A.R.L.—at the time of remand—are paramount in entering any such orders. *See In re Parental Responsibilities of M.W.*, 2012 COA 162, ¶¶ 26–27, 292 P.3d 1158 (on remand of parental responsibilities determination, trial court must provide the parties an opportunity to present additional evidence concerning the child's current circumstances). The existing parental responsibilities allocation shall remain in effect pending any new orders by the trial court. *See id.* at ¶ 27.

JUDGE WEBB and JUDGE BERNARD concur.