24CA0142 Parental Resp Conc BS 04-10-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA0142
Jefferson County District Court No. 15DR1510
Honorable Meegan A. Miloud, Judge

---

In re the Parental Responsibilities Concerning B.S. and A.S., Children,

and Concerning Anson Stodghill,

Appellant,

and

Bethany Brooks,

Appellee.

---

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division IV
Opinion by JUDGE HARRIS
Grove and Pawar, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 10, 2025

---

Family Law Center of the Rockies, Chris McLane, Golden, Colorado, for
Appellant

Wright Family Law, Jamie L. Wright, Centennial, Colorado, for Appellee

¶ 1    Anson Stodghill (father) appeals the district court's order modifying parenting time and child support for his two children with Bethany Brooks (mother).  We affirm in part, reverse in part, and remand the case for further proceedings.

## I.    Background

¶ 2    The parties have two children, B.S. (daughter) and A.S. (son). In January 2016, when daughter was seven and son was two, the district court allocated parental responsibilities in accordance with the parties' agreement, under which mother and father had approximately equal parenting time.

¶ 3    About six years later, mother moved to modify the parenting time order.  As she explained in the motion, in the interim, father had moved to Como, Colorado, a rural community about seventy-five miles away from mother's home in Littleton. Additionally, daughter, who had moved to Como to live with father at the beginning of the COVID-19 pandemic, had returned to mother's home and, with the assent of both parents, stopped visiting father.  Mother asserted that continuation of the equal parenting time schedule would disrupt the children's academic and

1

social lives, which were centered in Littleton.  Mother also raised concerns about father's ability to safely parent the children, but she nonetheless suggested that he have "reasonable time" with the children during school breaks and holidays.

¶ 4    At mother's request, the district court appointed a child and family investigator (CFI).  The CFI filed a report and an update recommending that father's parenting time be therapeutically supervised.

¶ 5    Mother immediately filed a motion to restrict parenting time, relying on the CFI's findings and recommendations.  Father objected to any change in parenting time with son but agreed that daughter should not have to resume visits.  After a hearing, a magistrate restricted father to therapeutically supervised parenting time with son, but, based on father's concession, the magistrate did not issue orders concerning daughter.

¶ 6    Fourteen months later, in November 2023, the court held a hearing on mother's motion to modify parenting time and her later-filed motion to modify child support.  By then, daughter was almost sixteen years old and, without objection from father, had not

had parenting time with him for over two years. As for son, he had not seen father since March 2023, when mother, at the suggestion of son's therapist, unilaterally ended father's supervised parenting time.

¶ 7 At the conclusion of the hearing, the court entered an oral ruling. Based on its finding that "contact between [father] and the children [is] emotionally endangering to them," the court declined to order any parenting time for daughter and continued restricted parenting time for son. Under the restriction, father's parenting time with son had to "begin with family or reunification therapy," pursuant to a plan to be developed by the therapists treating father and son.

¶ 8 With regard to child support, the court acknowledged that father received social security disability income (SSDI) benefits but also found that he was voluntarily underemployed. The court concluded that father could work full-time and imputed to him minimum wage income of $2,366 per month which, adding his $941 in SSDI benefits, gave him a total monthly income of $3,307.

Based on that income, the court ordered father to pay mother child support of $577 per month plus $5,200 in retroactive child support.

¶ 9 Finally, the court denied father's request for attorney fees, which was based on the disparity in the parties' economic circumstances. The court did not explain the reason for the denial.

¶ 10 On appeal, father challenges the court's endangerment findings, its alleged delegation of parenting time decisions to third parties, its imputation to him of full-time income, and its denial of his request for attorney fees.

## II. Parenting Time

¶ 11 Father contends that the district court erred by first restricting his parenting time with both children and then improperly delegating parenting time decisions to daughter and to the therapists treating father and son. We agree in part: we conclude that the court improperly delegated parenting time decisions for son to the third-party therapists.

### A. Legal Principles and Standard of Review

¶ 12 As a general matter, the court may modify parenting time whenever such modification will serve the best interests of the children. *See* § 14-10-129(1)(a)(I), C.R.S. 2024. But if the

4

modification amounts to a restriction of a parent's parenting time, the court may not order the modification unless it finds that "the parenting time would endanger the child's physical health or significantly impair the child's emotional development." § 14-10-129(1)(b)(I); *see also* § 14-10-129(2)(d) (court may not substantially modify parenting time and change the child's primary residence without making endangerment findings); *In re Marriage of Dale*, 2025 COA 29, ¶¶ 32-33 (A restriction on parenting time rights "means an order imposing a qualitative control over the manner, location, or environment in which the parent engages in parenting time," and requires an endangerment finding.).

¶ 13     Even if it makes those findings, the court must also determine that the particular restriction imposed is in the best interests of the child. *See In re Marriage of Hatton*, 160 P.3d 326, 332 (Colo. App. 2007). And if the restriction is termination of all contact between a parent and a child, the best interests standard requires the court to find that there is no less detrimental alternative. *Id.*

¶ 14     The district court has broad discretion to decide parenting time issues, and we will not reverse those decisions absent an

abuse of discretion. *In re Marriage of Collins*, 2023 COA 116M, ¶ 8. But the court must exercise that discretion itself; it may not delegate decisions about parenting time to third parties. *In Interest of D.R.V-A.*, 976 P.2d 881, 884 (Colo. App. 1999) (reversing order that delegated to family therapist decisions about when mother should be allowed to exercise unsupervised parenting time); *In re Marriage of Elmer*, 936 P.2d 617, 621 (Colo. App. 1997) (reversing order that delegated to child's psychiatrist the decision about when father's overnight visits would occur). And while we defer to the court's factual findings if supported by the record, we review its adherence to the statutory requirements de novo. *See In re Parental Responsibilities Concerning B.R.D.*, 2012 COA 63, ¶ 15.

## B.   Daughter

¶ 15    The court found that daughter would be emotionally endangered if ordered to have parenting time with father and that it was in her best interests for her to decide whether to see him.

¶ 16    Father argues that the evidence does not support an endangerment finding, the court should have considered a less detrimental alternative to ending parenting time, and the court

6

improperly delegated the parenting time decision to daughter. We reject these arguments.

### 1. Endangerment Findings

¶ 17    What constitutes endangerment is a highly individualized determination. *In re Marriage of Wenciker*, 2022 COA 74, ¶ 26. When the evidence on endangerment is conflicting, the district court's "findings resolving such conflicts are binding on review if they have record support." *Id.*

¶ 18    In making its endangerment findings, the court relied on testimony by the CFI and mother. According to the CFI, daughter had reported that "the home environment at [f]ather's was unhealthy for her mental health." When the CFI prepared her report, daughter's therapist told the CFI that daughter suffered from anxiety and depression and exhibited "some symptoms [of] post-traumatic stress." The therapist opined that daughter was not ready to see father, even in family therapy, and that any change in parenting time "could derail her progress" and "cause a regression." The CFI testified that daughter had engaged in cutting while at

father's home, and, at one point, daughter had expressed suicidal ideation, but father "did not obtain the services that [she] needed."

¶ 19    Mother testified that when daughter lived with father, "her personality, her demeanor, her physical appearance, . . . [and] the way that she talked about the world became very concerning and very dark."  She said that daughter had suffered from defecation accidents up to age thirteen, but that once daughter stopped seeing father, the accidents "[s]topped entirely," as did the self-harming behaviors.

¶ 20    Although father disputed some of that testimony, the evidence sufficiently supported the court's endangerment finding with respect to daughter.

## 2.    Least Detrimental Alternative

¶ 21    The concept of the "least detrimental alternative" recognizes that some "detriment to a child is present in every [parenting time] decision, [and] a court's task is to make the [parenting time] choice 'least detrimental' to the child." *In re Marriage of Martin*, 42 P.3d 75, 78 (Colo. App. 2002) (citation omitted).  The least detrimental

alternative analysis is generally subsumed within the best interests standard. *Id.*

¶ 22    Even assuming the court should have expressly considered whether a less detrimental alternative to termination of parenting time existed, *see Hatton*, 160 P.3d at 333, we conclude that any error was harmless.

¶ 23    For one thing, it was not even clear at the modification hearing that father was asking the court to compel daughter to attend parenting time. In the two years leading up to that hearing, father had expressly acquiesced to daughter's decision not to visit him. At the end of the hearing, mother's counsel represented that father "was not insisting or asserting any right toward a schedule with" daughter. Father did not dispute that representation. Instead, he merely requested that the court deny the modification motion.

¶ 24    Also, father did not offer any alternative to termination of parenting time, other than an implicit request to adhere to the schedule put in place eight years earlier, when daughter was seven years old and father and mother lived in the same city. By granting

the modification motion, the court necessarily rejected that alternative.

¶ 25     The court found instead that it was in daughter's best interests not to be forced into parenting time with father. That finding is supported by the evidence. The CFI recommended that daughter be permitted to decline visitation with father because she was "sufficiently mature to articulate her wishes" and "giving [her] agency" to decide whether visits "fe[lt] safe" would "further support[] [her] mental health treatment."

¶ 26     Under these circumstances, the court's failure to specifically address the least detrimental alternative did not affect father's substantial rights or the outcome of the proceedings. *See Bly v. Story*, 241 P.3d 529, 535 (Colo. 2010).

### 3. Delegation of Parenting Time Decisions

¶ 27     As noted, the court may not abdicate its decision-making authority and delegate entirely to third parties (or to the other parent) decisions about when or how parenting time will occur. *See Hatton*, 160 P.3d at 334.

¶ 28    After the court ruled that it would not order parenting time between father and daughter, it explained that daughter could nonetheless agree to see father "at her discretion."  Father says this ruling amounted to an improper delegation of parenting time decision-making to daughter.  We disagree.

¶ 29    The court did not delegate its authority to make parenting time decisions to another person.  The court itself made the decision about father's parenting time with daughter — by declining to order any parenting time based on its endangerment and best interests findings.  Thus, in contrast to the cases cited by father, the court here did not order parenting time and then leave to daughter the decision about how or when it would occur.  *See D.R.V-A.*, 976 P.2d at 884-85 (where court ordered supervised parenting time for mother and conditioned unsupervised parenting time on the family therapist's assent and recommendation, court improperly delegated parenting time decisions to a third party); *In re Marriage of McNamara*, 962 P.2d 330, 333-35 (Colo. App. 1998) (where court ordered "equal access to the children by both parents" but gave the guardian ad litem authority to modify parenting time

11

in the future, court improperly delegated parenting time decisions to a third party); *Elmer*, 936 P.2d at 620-21 (where court ordered parenting time for father but gave the child's psychiatrist authority to decide "when, and if," overnight visits would occur, court improperly delegated parenting time decisions to a third party); *see also In re Marriage of Dean*, 2017 COA 51, ¶ 22 (where court ordered parenting time for father, mother had to make a good faith effort to obtain the teenage children's compliance with the order). Instead, the court merely made clear that daughter could, of course, decide to see father in the absence of a court order — at her discretion.

### C. Son

¶ 30 We reach the opposite conclusion regarding delegation with respect to son, however. Even assuming the court made sufficient endangerment and best interests findings to support the continued restriction on parenting time — an issue we need not decide in light of our disposition — the court erred by delegating authority to the therapists to decide when, if ever, parenting time would occur.

¶ 31 In son's case, the court did not decline to order parenting time. Rather, it ordered that before any parenting time commenced, father and son had to participate in family or reunification therapy. But it gave complete control to the therapists to decide how or when to initiate the pre-parenting time therapy, ordering only that "both therapists talk [and] come up with a good plan." We agree that the court could have delayed reinstating supervised parenting time until certain conditions were met. We also agree that the court could have enlisted the therapists' involvement in identifying the conditions and devising a plan to implement them. But the court had to ultimately endorse a plan, order that it be executed, and then monitor compliance with it. It could not hand over all authority to the third-party therapists to decide whether and when father's parenting time would resume.

¶ 32 Mother's attempt to distinguish the case law prohibiting a court's delegation of parenting time decisions misses the mark. That some of the cases cited by father did not involve endangerment findings is irrelevant. The divisions' holdings turned not on why particular restrictions had been ordered but on whether the district

13

court had given third parties the authority to control if or when a parent exercised parenting time. We see no difference between the order in this case and the orders in *D.R.V-A., see* 976 P.2d at 885 (court could not delegate to therapist authority to decide when mother could participate in family therapy), and *Elmer, see* 936 P.2d at 621 (court could not delegate to child's psychiatrist the decision about when father's overnight visits would begin).[1]

¶ 33 Therefore, we reverse that portion of the judgment giving the third-party therapists authority to determine when family or reunification therapy will occur, and we remand the case to the district court for review of that issue. *See Elmer*, 936 P.2d at 621. Because any parenting time plan must be based on son's current

---

[1] Like the orders in those cases, the order here leaves father with limited recourse. Soon after the November 2023 hearing, the therapist notified father and his counsel that "it will take [son] at least a year if not longer" to be ready for therapy with father; the therapist would provide updates on son's progress only "as [she] deem[ed] necessary"; and when the therapist "fe[lt] [son] [wa]s ready," she would then refer father to a family therapist "approved by [her]" to determine whether father was ready for reunification therapy. According to the district court record, this case was closed as of February 2024, with no further developments regarding father's parenting time. *See Schnelle v. Cantafio*, 2024 COA 17, ¶ 2 n.1 (appellate court may take judicial notice of the court record in an underlying case under CRE 201(b)).

circumstances, *see id.*; *In re Parental Responsibilities Concerning M.W.*, 2012 COA 162, ¶ 27, we decline to address father's argument that the court's endangerment findings are insufficient to support the current restriction.

## III.    Child Support

¶ 34    Father contends that the district court erred by imputing full-time income to him without making necessary findings that he was shirking a child support obligation or that he was not physically or mentally "incapacitated." We agree with the first contention, so we do not resolve the second.

### A.    Legal Principles and Standard of Review

¶ 35    In calculating child support, the court must consider the parties' financial resources, including each parent's income. *See* § 14-10-115(2)(b)(II), (V), C.R.S. 2024. "Income" for purposes of the child support guidelines means the "actual gross income of a parent, if employed to full capacity, or potential income, if unemployed or underemployed." § 14-10-115(3)(c).

¶ 36    Potential income is used to calculate child support only if the parent is voluntarily unemployed or underemployed. *See* § 14-10-115(5)(b)(I). "'Voluntarily' in this context means that the

parent is underemployed 'intentionally, of free will.'" *In re Marriage of Garrett*, 2018 COA 154, ¶ 10 (quoting *People v. Martinez*, 70 P.3d 474, 477-78 (Colo. 2003)).  Thus, before the court may impute potential income to a parent, it must find that the parent is "shirking his or her child support obligation by unreasonably forgoing higher-paying, obtainable employment."  *Id.*

¶ 37    To determine if a parent is shirking a financial obligation, the district court must examine all the circumstances, including, as relevant here, whether the parent sought a job in the field in which he has experience and training; the availability of jobs for a person with the parent's level of education, training, and skills; the prevailing wage rates in the region; the parent's prior employment experience and history; and the parent's history of child support payment.  *Martinez*, 70 P.3d at 480.  "Imputation of income is an exception to computing child support based on actual income and should be applied with caution."  *Garrett*, ¶ 10.

¶ 38    To the extent mother contends that father failed to preserve his claim regarding income imputation, we reject that contention. At the hearing, mother's counsel argued that father was

16

underemployed and "capable of making more money," while father's counsel argued that father was "not able to work" and his actual income was limited to his benefits. The court considered the issue and adopted mother's view. Accordingly, the issue is preserved. *See In re Marriage of Young*, 2021 COA 96, ¶ 20.

¶ 39 Whether a parent is voluntarily underemployed is a mixed question of fact and law. *Id.* at ¶ 21. We defer to the district court's factual findings if they are supported by the record, but we review whether it applied the correct legal standards de novo. *Garrett*, ¶ 9.

### B. Insufficient Findings or Evidence of Shirking

¶ 40 In its oral ruling, the district court found that

- father receives $914 per month in SSDI benefits;

- father operates a dog training business on his property, and has an active website;

- father has been employed in the past and "has the ability to be employed";

- father's testimony that he "has no income" beyond the SSDI benefits was not credible; and

- father does not contribute to the children's expenses.

¶ 41    The court did not expressly find that father was shirking a financial obligation.  And while an explicit finding may not be necessary, the court did not make sufficient factual findings to support an implicit shirking finding either.  For example, it did not make any findings on the availability of jobs for a person with father's level of education, training and skills, and, importantly, with a comparable disability.  And while the court found that father had been employed "in the past," there was no evidence concerning when father had last held a full-time job.  (The court also did not determine whether father could work full-time and continue to receive SSDI benefits.  If not, calculating child support based on full-time wages plus SSDI benefits was clearly erroneous.)

¶ 42    The evidence established that father "had a nonprofit [company] training service dogs" for veterans that he operated from his home.  He testified that he had received some donations for his work but that "those had ceased" more than a year before the hearing.  The court found that father's testimony about his income (reported as zero, except for government benefits) was not credible, but it did not attempt to determine father's actual income.  If father

18

had actual income from employment, the court should have considered that income in calculating child support. *See* § 14-10-115(5)(a)(I).

¶ 43    In sum, considering all of the circumstances, we conclude that the court's findings are insufficient to support its decision to impute full-time employment to father. Thus, we reverse the child support award and remand for further proceedings. *See Garrett*, ¶ 16 (remanding where the district court, in imputing income to mother, considered some but not all of the relevant factors and failed to make an express finding of shirking). On remand, the court must consider the parties' current financial circumstances when determining father's income and recalculating child support. *See In re Marriage of Schaefer*, 2022 COA 112, ¶ 41.

## IV.    Attorney Fees

¶ 44    Father contends that the district court erred in denying his request for attorney fees under section 14-10-119, C.R.S. 2024.

¶ 45    Under section 14-10-119, the district court may equitably apportion attorney fees and costs between the parties based on their relative economic circumstances. *See Collins*, ¶ 49. Because

19

we conclude that the court must reconsider father's income on remand, we reverse the denial of attorney fees and direct the district court to consider father's request anew on remand.

¶ 46     Both parties request appellate attorney fees, father under section 14-10-119, and mother under section 13-17-102, C.R.S. 2024, on the ground that father's appeal was frivolous.

¶ 47     The district court is better equipped to address the factual issues associated with father's section 14-10-119 attorney fee request.  Accordingly, we direct the district court to consider the request on remand, based on the parties' financial circumstances at the time of the remand proceedings.  *See In re Marriage of Schlundt*, 2021 COA 58, ¶ 54.  In light of our disposition, we deny mother's request for appellate attorney fees.  *See In re Marriage of Sheehan*, 2022 COA 29, ¶ 64.

## V.    Disposition

¶ 48     We reverse the portion of the judgment restricting father's parenting time and modifying child support, and we remand the case to the district court for further proceedings.  On remand, the court must determine parenting time between father and son

without delegating the decision to a third party, and it must make additional findings concerning father's income. Finally, the court should consider father's request for attorney fees under section 14-10-119.

JUDGE GROVE and JUDGE PAWAR concur.