ISHEE, JUSTICE, FOR THE COURT:
¶ 1. Christina Strickland and Kimberly Day were a same-sex couple legally married in Massachusetts in 2009-a marriage that later was recognized legally in Mississippi. At the time of their marriage, the couple resided in Mississippi. A year later, the newlywed couple sought to bring a child into their family through the use of artificial insemination (AI) of sperm from an anonymous donor. Kimberly served as *488 the gestational mother and eventually gave birth to Z.S.[1] in 2011. Z.S. was born in Mississippi.
¶ 2. The couple separated in 2013. And eventually, in October 2016, the Rankin County Chancery Court entered a final judgment of divorce. In the judgment, the chancery court found, among other things, that Christina acted in loco parentis to Z.S., but that Christina was not Z.S.'s legal parent. Central to the chancery court's decision was the finding that the anonymous sperm donor had parental rights that must be terminated and thus precluded Christina from being Z.S.'s legal parent. Christina appeals to this Court.
¶ 3. This case presents an issue of first impression. We never before have addressed what rights, if any, an anonymous sperm donor has in a child conceived of his sperm. Accordingly, we must determine whether the chancery court erred in finding that the rights of the anonymous sperm donor precluded a finding that Christina was Z.S.'s legal parent. After review of the record and the relevant law, we find that the chancery court erred in this finding. First, an anonymous sperm donor is not a legal parent whose rights must be terminated. And second, the doctrine of equitable estoppel precludes Kimberly from challenging Christina's legal parentage of Z.S. And so we reverse the findings of the chancery court and remand the case for a custody determination in a manner that is consistent with this opinion.
FACTS AND PROCEDURAL HISTORY
¶ 4. Christina and Kimberly first began a romantic relationship in 1999. Later, while still unmarried, the couple decided to adopt a child. After going through the adoption process, the couple adopted a child named E.J.,[2] finalized in 2007. Kimberly alone served as the adoptive parent because Mississippi law precluded same-sex couples from adopting jointly. In 2009, Kimberly and Christina were married in Massachusetts. Kimberly took Christina's last name.
¶ 5. In 2010, the newlywed couple decided to add to their family through the use of assisted reproductive technology[3] (ART)-specifically, AI of sperm from an anonymous donor. Both Kimberly and Christina considered, and were evaluated to determine, which one of them should carry the child. And after testing and consultation with a fertility clinic, the couple decided that Kimberly would serve as the gestational mother, and that they first would attempt in vitro fertilization[4] (IVF) with Kimberly's ova.
¶ 6. They searched for sperm, eventually choosing sperm from a Maryland sperm bank. The name of the anonymous donor is unknown and he was identified only as a number-"Donor No. 2687." Kimberly signed an acknowledgment agreeing that she would "never seek to identify the donor." The acknowledgment further stipulated that the donor never would be advised of Kimberly's identity. In the clinic paperwork, Kimberly was recognized as a *489 married woman, and Christina was identified as her spouse. Both women signed an acknowledgment stating that they were:
voluntarily undergoing, individually and as a couple, treatment ... in order to conceive a child through this treatment and that [they] acknowledged [their] natural parentage of any child born to [them] through this technique.
Christina testified that she was involved in and supportive through every step of the conception and pregnancy.
¶ 7. As for the birth of Z.S., Christina testified that the couple planned on traveling to Massachusetts to have the child, so that both she and Kimberly could be listed as parents on the birth certificate. But on April 12, 2011, six weeks before her due date, Kimberly gave birth to Z.S. via a cesarean section in a Mississippi hospital. The reason Z.S. was born in Mississippi, and not in Massachusetts, is disputed. Kimberly claimed it was because she did not want Christina on the birth certificate,[5] while on the other hand, Christina claimed it was due to the unforseen, emergency cesarean section. Nevertheless, because Z.S. was born in Mississippi, Kimberly's name was the only name placed on his birth certificate.
¶ 8. As it relates to child rearing, Christina testified that, as a family unit, Kimberly and she raised their two children as coparents. And during the first year of Z.S.'s life, Christina stayed home with him while Kimberly worked full time. Christina further testified that the children-both Z.S. and E.J.-share a close child-parent bond with her, and they call her "Mom."
¶ 9. In January 2013, Christina and Kimberly separated. Following the separation, Christina continued to visit both children. She also paid child support, medical, and daycare expenses for Z.S.
¶ 10. On August 13, 2015, while still married to Christina, Kimberly married a second spouse. Christina then filed for divorce in the Harrison County Chancery Court on August 31, 2015. On November 16, 2015, Kimberly filed a motion for declaratory judgment and complaint for divorce in the Rankin County Circuit Court. In that motion, Kimberly sought a declaration that her second marriage was valid and that her first marriage was dissolved. Christina then filed her answer and counterclaim for divorce in which she sought legal and physical custody of the children, and to be named a parent of Z.S. The Harrison County and Rankin County cases were consolidated in Rankin County. And on May 17, 2016, an order was entered declaring Christina's and Kimberly's marriage valid, and Kimberly's remarriage void.
¶ 11. On September 27, 2016, Kimberly and Christina filed a consent and stipulation agreeing that Z.S. was born during their marriage, that they jointly would pay all school expenses for Z.S., and that Kimberly would retain physical and legal custody of E.J. Kimberly and Christina agreed to allow the chancery court to decide custody, visitation, and child support as to Z.S., child support and visitation of E.J., and Christina's parentage of Z.S.
¶ 12. A hearing was held on September 27, 2016, and a final judgment of divorce was entered on October 18, 2016. In the final judgment, the chancery court made various findings. Relevant to this appeal, the chancery court ordered Christina to pay child support for both children, and held that Z.S. was born during a valid marriage. But the chancery court held that Z.S. was "a child born *490 during the marriage, not of the marriage," and so both parties were not considered parents. The chancery court found that the anonymous sperm donor constituted "an absent father," and even though the donor might never be identified, the donor's legal parentage precluded a determination that Christina was Z.S.'s legal parent. The chancery court concluded that Christina had acted in loco parentis[6] to Z.S. and awarded her visitation rights.
¶ 13. On October 21, 2016, three days after entry of the final judgment, Christina filed her timely notice of appeal.
STANDARD OF REVIEW
¶ 14. A chancellor's findings will not be disturbed on review unless he abused his discretion, was manifestly wrong, or made a finding which was clearly erroneous. Bank of Mississippi v. Hollingsworth , 609 So.2d 422, 424 (Miss. 1992). A chancellor's conclusions of law are reviewed de novo. Consolidated Pipe & Supply Co. v. Colter , 735 So.2d 958, 961 (Miss. 1999). Because the issues here raise questions of whether a chancellor correctly applied the law, we review this case de novo.
DISCUSSION
I. Parental Rights and Anonymous Sperm Donors
¶ 15. The chancery court's decision, finding Christina not the legal parent of Z.S., turned largely on its determination that the sperm donor was the "natural father," whose parental rights were subject to termination. On appeal, Christina argues that this finding is not supported by the evidence and is an erroneous conclusion of law. We agree.
¶ 16. At the outset, we are cognizant of the fact that we never before have determined what parental rights, if any, anonymous sperm donors possess in the children conceived through the use of their sperm. As such, this is an issue of first impression.
¶ 17. In searching our state's existing law, the only law that even addresses AI is the disestablishment-of-paternity statute- Mississippi Code Section 93-9-10(2)(d) (Rev. 2013). And while Section 93-9-10(2)(d) does not address anonymous sperm donors' parental rights directly, we find it useful as it illustrates the Legislature's intent on such rights. Indeed, under Section 93-9-10(2)(d), a father cannot seek to disestablish paternity when the child was conceived by AI during the marriage to the child's mother. Reading this provision, in light of the context before us, the logical conclusion-while not explicit-is that the Legislature never intended for an anonymous sperm donor to have parental rights in a child conceived from his sperm-irrespective of the sex of the married couple that utilized his sperm to have that child.
¶ 18. How, on one hand, can the law contemplate that a donor is a legal parent who must have his rights terminated, while at the same time prohibiting the nonbiological father of a child conceived through AI from disestablishing paternity? These two policies cannot co-exist. And for one to make such a logical leap effectively would say that the child has three legal parents: the mother who birthed the child, the natural father who donated his sperm, and the *491 person who was married to the child's mother (and is statutorily prohibited from disestablishing paternity). Three parents-that cannot be what the Legislature intended. Indeed, even the chancery court here said that cannot be possible.
¶ 19. In making its determination, the chancery court seemed to place great weight on the biological connection between the anonymous sperm donor and Z.S. Yet the Supreme Court of the United States has held that "[p]arental rights do not spring full-blown from the biological connection between the parent and child. They require relationships more enduring ." Lehr v. Robertson , 463 U.S. 248, 260, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983) (quoting Caban v. Mohammed , 441 U.S. 380, 397, 99 S.Ct. 1760, 60 L.Ed. 2d 297 (1979) (Stewart, J., dissenting) ) (emphasis added). In a similar vein, we too have held that a biological connection alone is not enough to establish parentage. See Griffith v. Pell , 881 So.2d 184, 186 (Miss. 2004) (finding that a biological father does not have any paternity rights where "he fails to establish that he has had a substantial relationship with the child").
¶ 20. As a broader policy consideration, we find that requiring parents of a child conceived through the use of AI to terminate parental rights of the donor would not be in the best interest of the child-to say nothing of the expense and time it would require. When children are involved, we consistently have held that "the polestar consideration ... is the best interest and welfare of the child." Albright v. Albright , 437 So.2d 1003, 1005 (Miss. 1983).
¶ 21. The consequences of assigning rights to donors, who do not engage in an act of procreation but provide biological material with no intention to act as a parent, would disrupt the familial relationships and expectations of Mississippians who have conceived children through the use of AI. For one, it would elevate the rights of a donor-who is a complete stranger to the child, and likely never will be identified-over the rights of a person who has known and cared for the child. Make no mistake-affirmance here arguably would impose parentage, and all its responsibilities, on anonymous sperm donors who contribute sperm to assist families in achieving pregnancy-perhaps creating a chilling effect on sperm donation. Furthermore, it effectively would leave many children conceived through this method with one legal parent. And in the tragic situation in which a mother dies during childbirth or before a proper termination proceeding-it would leave the child an orphan. Such a notion is untenable and certainly contrary to the public policy of this state.
¶ 22. On appeal, Kimberly's position is that all of the nonbiological parents of children conceived through AI should be required to terminate the sperm donor's parental rights and then establish parentage through the adoption process. We disagree. As a practical matter, the process of requiring one under these circumstances to adopt her own child (one which she intentionally agreed to bring into the family) would be intrusive, time-consuming, and expensive. In fact, it would require: parents who use AI with anonymous sperm donation to file a petition and wait thirty days to seek a hearing; a guardian ad litem to be appointed by the court at the parents' expense; and a hearing to be held to determine whether an unknowable sperm donor has abandoned the child. See Miss. Code Ann. § 93-15-107 (Rev. 2013).
¶ 23. One of the rationales behind termination statutes no doubt is to safeguard the rights of any potential parent-child relationship. Indeed, this Court has held that "[p]arents have a liberty interest, more precious than any property interest, *492 in the care, custody, and management of their children and families." G.Q.A. v. Harrison Cty. Dep't of Human Res. , 771 So.2d 331, 335 (Miss. 2000) (citing Santosky v. Kramer , 455 U.S. 745, 753-54, 758-59, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) ). The seriousness of the action is reflected in the fact that termination of such rights requires clear and convincing evidence of the statutory grounds for termination. Chism v. Bright , 152 So.3d 318, 322 (Miss. 2014) (citing Kramer , 455 U.S. at 754, 102 S.Ct. 1388 ).
¶ 24. But with anonymous sperm donors there is no reason to protect the donor, as the donor has no intention or desire to act as a father. In reaching its conclusion in this case, the chancery court found that the donor was merely an "absent father," but in reality, the donor is a nonexistent father. For the child could never find the donor, much less have a meaningful relationship with him. It is one thing for a child to cling to the hope of a possibility of discovering and eventually building a relationship with an absent father; it is quite another thing for a child to know that he has a natural father that he has no possibility of ever discovering, let alone having a relationship with. That is, short of perhaps a court order mandating the disclosure of the donor's identity, it is arguably factually and legally impossible for the child ever to obtain the identity of the donor.
¶ 25. The impracticality and futility of applying the termination statute in this context is clear. Under Section 93-15-107, the natural father is a necessary party to such termination action, but here, or with any anonymous donor, whose identification cannot be known, compliance with the statute arguably is impossible. One cannot serve a party with no information to act upon and which likely never can be acquired.
¶ 26. To that end, Kimberly argues that Christina, and nonbiological parents alike, can effectuate this service though publication. To be sure, the text of the statute does allow for publication of service of a "necessary party whose address is unknown after diligent search[.]" Miss. Code Ann. § 93-15-107(1)(b) (Rev. 2013) (emphasis added.) Publication in this instance is for a party whose address is unknown, not a party whose identity is unknown. (Emphasis added). What is more, how can it be evaluated whether there was a diligent search for the party, if the party is unknown? The chancery court itself conceded that it is unlikely that the donor ever could be hailed before the court. The chancery court also conceded that this donor's identification likely would never be known. And with an absence of identification, publication practically cannot be effectuated in every case in which a couple utilizes AI to bring a child into the family. Indeed, publication under the statute presupposes that, while one may not know the exact location of the party, one at least knows, at a minimum, the identity of the party. This is not to say that, under these circumstances, service by publication could not be accomplished; it is, however, to say that, as a matter of public policy, we find it unwise to demand that it must be accomplished.
¶ 27. And so, we ask, would it not be futile for the chancery court to require parties to comply with a statute the chancery court itself admits cannot be satisfied due to reasons beyond the control of the parties? Though this exact question is not before us here, we find it demonstrative of the impracticability and futility of requiring compliance with Section 93-15-107(1)(b) in this context.
¶ 28. Aside from our determination that anonymous sperm donors, in general, do not possess parental rights in the *493 children conceived through the use of their sperm, we also find that there is no other vehicle which allows us to conclude that the anonymous sperm donor here is Z.S.'s parent. The donor was not married to the mother at the time of Z.S.'s conception or birth, he has not executed a voluntary acknowledgment of paternity, and he has not been adjudicated to be the child's "natural" father under state law. Miss. Code Ann. § 93-9-28 (Rev. 2013).
¶ 29. In sum, we find that the chancery court erred in finding that an anonymous sperm donor was Z.S.'s parent whose parental rights had to be terminated. Indeed, we find that there is no legal or policy basis to find that an anonymous sperm donor is a parent in this specific context.
II. Equitable Estoppel
¶ 30. Christina argues that the chancery court erred in failing to apply equitable estoppel as a bar to Kimberly's argument that Christina was not Z.S.'s legal parent. At the very core of the doctrine of equitable estoppel are "fundamental notions of justice and fair dealings." PMZ Oil Co. v. Lucroy , 449 So.2d 201, 206 (Miss. 1984). The doctrine applies when "there is a (1) belief and reliance on some representation; (2) a change of position as a result thereof; and (3) detriment or prejudice caused by the change of position." B.C. Rogers Poultry Inc. v. Wedgeworth , 911 So.2d 483, 492 (Miss. 2005). Indeed, we previously have defined equitable estoppel "as the principle by which a party is precluded from denying any material fact , induced by his words or conduct upon which a person relied, whereby the person changed his position in such a way that injury would be suffered if such denial or contrary assertion was allowed." Koval v. Koval , 576 So.2d 134, 137 (Miss. 1991) (emphasis added).
¶ 31. Reviewing the record before us, we find that the elements of estoppel are met here. First, the evidence in the record shows that Kimberly made numerous representations that Christina was an equal coparent to Z.S. Indeed, Kimberly, along with Christina, signed an agreement at the clinic acknowledging the couple's joint intention to undergo the AI procedure. Additionally, after the birth of Z.S., the couple sent out birth announcements that read: "Hatched by Two Chicks. Chris[tina] and Kimberly proudly announce the birth of their son." And the record is replete with evidence of Christina's belief and reliance on this representation.
¶ 32. Second, as a result of her belief of and reliance on Kimberly's representation, Christina clearly changed her position. For example, Christina signed an acknowledgment to undergo the AI treatment with Kimberly as "a couple," served as Z.S.'s primary caretaker for at least the first year of the child's life, and gave Z.S. her last name-Strickland. And lastly, the record shows that Christina suffered detriment which was caused by the change of position. That is, by changing her position in reliance on her belief that she would be an equal coparent, Christina took on all the responsibilities and rewards that accompany parenthood. To now deprive Christina of these responsibilities and rewards, and diminish her parent-child relationship with Z.S., is certainly a detriment to Christina, to say nothing of the detriment to Z.S. himself.
¶ 33. At the hearing, Kimberly argued that the fact that she was married to Christina at the time was not material to her decision to have Z.S.; she was planning on having a child of her own regardless of her marital circumstances. But the evidence in the record belies this assertion. For one, Kimberly allowed Christina to take part in the process of conceiving *494 Z.S.-even signing an acknowledgment at the clinic together. In fact, in the clinic paperwork, Kimberly was recognized as a married woman, and Christina was specifically identified as her spouse. What is more, Kimberly admitted in her testimony that the couple had discussed the possibility of Christina, and not Kimberly, carrying and having the baby. This further evidences the couple's plan to undertake the role of parenthood together, as it undercuts Kimberly's assertion that her primary reason for having Z.S. was to fulfill a lifelong desire to have a child biologically her own. It also is particularly telling that Kimberly and Christina sent out birth announcements which held out Z.S. as their own. Simply put, it is strong evidence of Kimberly's position regarding Christina's coparent status. This announcement, by its own terms, represented to those receiving it that both Kimberly and Christina were Z.S.'s parents.
¶ 34. All this in the record shows that Kimberly's original representation was that Christina was Z.S.'s equal coparent, and that Christina relied on this representation in changing her position. To now allow Kimberly to challenge Christina's parentage of Z.S. undoubtedly will cause injury to Christina and the child. The gravity of the injury is particularly clear in this case, as Christina has had to confront the possibility that Kimberly will allow another adult to adopt Z.S. And Christina, with an inferior in loco parentis status, could do nothing to prevent it. At bottom, to deny Christina the relationship she has built with Z.S. would be a miscarriage of justice. And so, we find that Kimberly is estopped from challenging Christina's parental rights as to Z.S., as this position is wholly inconsistent with her earlier position, which held Christina out to be the parent of Z.S.
CONCLUSION
¶ 35. In this case of first impression, we hold that under Mississippi law, an anonymous sperm donor does not possess any parental rights in a child conceived through the use of his sperm. And to that end, the chancery court erred in finding that the anonymous sperm donor here was Z.S.'s parent, whose rights were subject to termination.
¶ 36. As for Christina's parental rights, we hold that the doctrine of equitable estoppel precluded Kimberly from challenging Christina's parentage of Z.S.-where there was ample evidence the then-married couple jointly and intentionally agreed to have Z.S. through the use of AI. In reaching this holding, we reverse the chancery court's finding that Christina acted in loco parentis , but was not an equal parent with parental rights as to Z.S. And so we remand the case to the Rankin County Chancery Court with instructions to determine custody as to Z.S. in accord with the multifactor test articulated in Albright , 437 So.2d at 1005. The Albright analysis shall be on the record, and with a guardian ad litem representing Z.S. through the course of the proceedings. See generally Albright , 437 So.2d at 1005.
¶ 37. REVERSED, RENDERED IN PART, AND REMANDED IN PART.
KITCHENS, P.J., KING AND BEAM, JJ., CONCUR. WALLER, C.J., CONCURS IN PART AND IN RESULT WITH SEPARATE WRITTEN OPINION JOINED IN PART BY RANDOLPH, P.J., COLEMAN, MAXWELL AND CHAMBERLIN, J J. COLEMAN, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY CHAMBERLIN, J.; RANDOLPH, P.J., AND MAXWELL, J., JOIN IN PART. MAXWELL, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY RANDOLPH , P.J., AND COLEMAN, J.; CHAMBERLIN, J., JOINS IN PART. RANDOLPH, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED IN PART BY COLEMAN, MAXWELL AND CHAMBERLIN, JJ.
WALLER, CHIEF JUSTICE, CONCURRING IN PART AND IN RESULT:
*495 ¶ 38. The narrow issue before the Court is whether two people legally married who jointly engage in a process of assisted reproduction technology resulting in the natural birth by the gestational mother are both considered parents for purposes of divorce and determination of parental rights of the minor child. I conclude that they are and that the decision of the chancellor should be reversed and remanded.
¶ 39. This decision is based on the legal status of the parties at the time of birth and on the basis of equitable estoppel. The conception and birth was a process both parties agreed to and relied upon. Simmons Hous., Inc. v. Shelton ex rel. Shelton , 36 So.3d 1283, 1287 (¶ 15) (Miss. 2010) (Equitable estoppel "is defined generally as 'the principle by which a party is precluded from denying any material fact, induced by his words or conduct upon which a person relied, whereby the person changed his position in such a way that injury would be suffered if such denial or contrary assertion was allowed.' "). See also Koval v. Koval , 576 So.2d 134, 137 (Miss. 1991) ("The doctrine of estoppel is based upon the ground of public policy, fair dealing, good faith and justice, and its purpose is to forbid one to speak against his own act, representations, or commitments to the injury of one to whom they were directed and who reasonably relied thereon.").
¶ 40. While this Court can use common-law principles to render a decision here,[7] the Legislature should speak directly to the recognition of the legal status of children born during a marriage as the result of assisted reproductive technology. Miss. Baptist Hosp. v. Holmes , 214 Miss. 906, 931, 55 So.2d 142, 152 (1951) ("[T]he function of creating a public policy is primarily one to be exercised by the Legislature and not by the courts."). The Legislature has spoken that a spouse cannot "disestablish" paternity of a child born by this process. Miss. Code Ann. § 93-9-10(2)(d) (Rev. 2013). Today's decision is the only logical extension of that code section, but the Legislature should nonetheless further address these developments in the law.
¶ 41. For the preceding reasons, I respectfully concur only in part and in the result.
RANDOLPH, P.J., COLEMAN, MAXWELL AND CHAMBERLIN, JJ., JOIN THIS OPINION IN PART.

Because Z.S. was a minor at the time, initials will be used to protect his anonymity.

Because E.J. was a minor at the time, initials will be used to protect his anonymity.

ART refers to various practices and procedures beyond AI, including in vitro fertilization, intracytoplasmic sperm injection, egg donation, and surrogacy, which provide individuals the opportunity to conceive children other than through sexual intercourse.

IVF refers to a method of fertilizing a human ovum outside of the body. K. Anderson, L. Anderson, and W. Glanze, IVF , Mosby's Medical, Nursing, & Allied Health Dictionary 842 (4th ed. 1994).

Mississippi law at the time precluded both members of a same-sex couple from being listed on a birth certificate. See Miss. Code Ann. § 41-57-14 (Rev. 2013).

"[A] person acting in loco parentis [is] one who has assumed the status and obligations of a parent without a formal adoption." Logan v. Logan , 730 So.2d 1124, 1126 (Miss. 1998). A person acting in loco parentis has a right to custody of a child, but only against third persons. Farve v. Medders , 241 Miss. 75, 128 So.2d 877, 879 (1961). The custody rights of a person holding this status are inferior to the custody rights of the natural parent. Davis v. Vaughn , 126 So.3d 33, 37 (Miss. 2013).

See Funk v. United States , 290 U.S. 371, 383, 54 S.Ct. 212, 216, 78 L.Ed. 369 (1933) (noting the power of the "courts, in the complete absence of ... legislation on the subject, to declare and effectuate, upon common-law principles, what is the present rule upon a given subject in the light of fundamentally altered conditions[.]"); State v. Edward Hines Lumber Co. , 150 Miss. 1, 115 So. 598, 605 (1928) ( [T]he public policy of the state must be found in its constitution and statutes, 'and when they have not directly spoken, then in the decisions of the courts ....' ").