

# NUMBER 13-18-00219-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

JENNIFER MARIE TRETO,                                          Appellant,

v.

SANDRA LILIBETH ORTEGA TRETO,                                 Appellee.

On appeal from the 138th District Court
of Cameron County, Texas.

# O P I N I O N

**Before Chief Justice Contreras and Justices Benavides and Longoria**
**Opinion by Justice Benavides**

Appellant Jennifer Marie Treto appeals from a final divorce decree from appellee Sandra Lilibeth Ortega Treto that established Jennifer as a parental conservator and ordered her to pay child support. By a single issue, Jennifer argues that the trial court erred by so ruling when she has no biological relationship to the child. We affirm.

## I. BACKGROUND

Jennifer and Sandra were married in New Mexico in August 2014, after about a year of dating. They were divorced on October 16, 2017, in an uncontested proceeding after Jennifer signed a waiver of service. Jennifer filed a motion for new trial. After the trial court granted the motion for new trial, a contested hearing was held in March 2018 from which this appeal is taken.

Both Jennifer and Sandra testified at trial, as did Cesar Gomez. At the time Jennifer and Sandra were married, Jennifer had a one-year-old child unrelated to their relationship. Before they married, they discussed having a child together. Sandra was very interested in having a child, according to Jennifer's testimony. At first, they discussed Sandra continuing to be sexually active with her former boyfriend to get pregnant. After they married, Gomez, one of their friends, volunteered to donate sperm to help them. They met with Gomez and reached an oral agreement that he would be a sperm donor. They agreed to pay Gomez $200 for each sperm donation.

Sandra and Jennifer agreed that Sandra would carry the child. They bought an ovulation kit and began tracking Sandra's menstruation and ovulation. Sandra also began taking prenatal vitamins. In October 2014, they contacted Gomez and asked him to come to their apartment for a sperm donation because Sandra was ovulating. He used their bathroom and ejaculated into a sterile cup the women provided. Gomez gave the cup to Jennifer who injected the sperm to inseminate Sandra. Two weeks later, Jennifer bought home pregnancy tests and Sandra got a positive test result.

2

During Sandra's pregnancy, Jennifer accompanied her to nearly all of her doctor visits and went to both sonogram appointments. Friends held a baby shower for the two of them in May 2015. Jennifer was at the hospital when the baby was born by cesarean section. Both women took family leave from work to be home with the baby in July 2015. In January 2016, Jennifer moved out and Sandra later filed for divorce.

## II.  PARENTAL RIGHTS

Jennifer argues that the Texas Family Code defines "parents" in terms of a mother and a father and those definitions preclude the trial court's ruling declaring her a parent conservator and ordering child support. *See* TEX. FAM. CODE ANN. §§ 101.024, 102.003(a)(9) (limiting standing for nonparents to seek conservatorship when they have had actual care and control of a child). On the other hand, Sandra argues that the Texas Family Code must be read in accord with the United States' Supreme Court's recognition of same-sex marriage in *Obergefell v. Hodges*, ___ U.S. ___, 135 S.Ct. 2584, 2607–08 (2015), and its recognition that a host of other benefits are attached to marital status that may not be denied to same sex couples. *See Pavan v. Smith*, ___ U.S. ___, 137 S.Ct. 2075, 2078–79 (2017) (holding that an Arkansas statute that treated children of same-sex married couples differently than married heterosexual couples was unconstitutional).

### A.  Standard of Review

We review a trial court's orders arising out of divorce proceedings, child custody, child support, and visitation for an abuse of discretion. *Iliff v. Iliff*, 339 S.W.3d 74, 78 (Tex. 2011); *MacCallum v. MacCallum*, 801 S.W.2d 579, 582 (Tex. App.—Corpus Christi–Edinburg 1990, writ denied). A trial court abuses its discretion when it acts arbitrarily or

3

unreasonably, without reference to guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). A trial court also abuses its discretion by failing to analyze or apply the law correctly. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992).

When Texas law conflicts with federal constitutional rights as set forth by the United States Supreme Court, the constitutional rights as declared become the law of the land. *See Avery v. Midland County*, 390 U.S. 474, 485–86 (1968) (declaring that apportionment of Midland County Commissioners' districts violated the equal protection clause); *McKinney v. Blankenship*, 282 S.W.2d 691, 695 (Tex. 1955) (recognizing the overruling of Texas constitutional and statutory provisions by *Brown v. Board of Education of Topeka*, 347 U.S. 483 (1954)).

## B.  Texas Statutory Law Relating to Children of a Marriage

By her single issue, Jennifer argues that the trial judge erred as a matter of law by ruling that she is a parent and ordering her to pay child support for the child born by Sandra during their marriage. To understand Jennifer's argument, we must first review the Texas Family Code.

Under the family code, a "parent" is defined to be: "the mother, a man presumed to be the father, a man legally determined to be the father, a man who has been adjudicated to be the father by a court of competent jurisdiction, a man who has acknowledged his paternity under applicable law, or an adoptive mother or father." TEX. FAM. CODE ANN. § 101.024(a). A suit affecting the parent-child relationship may be filed at any time by: a parent of the child, a custodian or person having the right of visitation

4

with or access to the child appointed by an order of a court; a child's guardian; a man alleging himself to be the child's father in accord with Chapter 160; a person who has had actual care, control and possession of the child for at least six months ending not longer than ninety days before suit was filed; and other persons specified in § 102.003. *See id.* § 102.003.

In 2000, the Texas Legislature adopted the Uniform Parentage Act (UPA). *See* Act of May 25, 2001, 77th Leg., R.S., ch. 821, § 1.01, 2001 Tex. Gen. Laws 1610. Chapter 160 of the family code defines parentage. *See* TEX. FAM. CODE ANN. ch. 160. Under the family code, the mother-child relationship is established between a woman and child by: giving birth, adjudication of maternity, or adoption. *See id.* § 160.201(a). The father-child relationship is established between a man and a child by: an unrebutted presumption of paternity pursuant to § 160.204; an effective acknowledgement of paternity; an adjudication of paternity; adoption; or the man's consent to assisted reproduction by his wife under Subchapter H that resulted in the birth of the child. *Id.* §§ 160.201(b), 160.703. A man is presumed to be the father of a child if he is married to the mother of the child and the child is born during the marriage. *See id.* § 160.204(a)(1). Section 160.106 also provides that "[t]he provisions of this chapter relating to the determination of paternity apply to a determination of maternity." *Id.* § 160.106.

## C.    Analysis

Jennifer's argument that she is not a parent of the child is two-pronged: (1) she is not related to the child biologically, and (2) the family code does not recognize her as a parent. However, Jennifer ignores the portions of the family code that do not require a

biological relationship to qualify as a parent, and specifically § 160.106 which provides that maternity may be established in the same way as paternity under the family code. *See* TEX. FAM. CODE ANN. §§ 101.024(a), 160.106, 160.204.

Jennifer cites *In re P.S.* which stands for the proposition that self-help artificial insemination (not performed by a physician) enables the man who donated sperm to be named as a father to the child produced by insemination. *See* 505 S.W.3d 106, 110 (Tex. App.—Fort Worth 2016, no pet.) (construing TEX. FAM. CODE ANN. § 160.102(6)). However, in this case, that argument is inapposite because the trial court did not find that Gomez, the sperm donor, was the father and Gomez did not seek to be named the father unlike M.S., the biological father of P.S. *Id.* at 110*.* Here, the issue is whether the same-sex spouse of a woman who conceived a child using self-help artificial insemination with the intention of having a child of the marriage is a parent of that child and thereby entitled to all of the liabilities and benefits of parenthood under the Texas Family Code.[1]

The facts testified to by both parties reveal that they do not fit within the statutory definitions which contemplate traditional gender roles and marriage between a man and a woman. If gender was not an issue, Jennifer would constitute a presumed "father" because she was married to Sandra at the time Sandra became pregnant and the child was born of the marriage. *See* TEX. FAM. CODE ANN. § 160.204(a)(1).

---

[1] Jennifer also cites *In re H.S.* which describes the standing requirement for non-parents to bring a suit affecting the parent-child relationship. 550 S.W.3d 151, 155–56 (Tex. 2018). In *H.S.* the suit was brought by grandparents. Here, there is no dispute that both Jennifer and Sandra had standing in the underlying divorce proceedings.

### 1. Section 160.106

There was a common-law presumption that a child born to a married woman during marriage was a child of the marriage. *See In re Shockley*, 123 S.W.3d 642, 648–49 (Tex. App.—El Paso 2003, no pet.) (discussing history of marital presumption). That presumption was later codified in Texas law. *See* TEX. FAM. CODE ANN. § 160.204(a)(1). Although that presumption was once based upon concerns about illegitimacy and ensuring inheritance, the presumption also promoted family stability. *See In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994) (discussing history of marital presumption). Section 160.106 states that: "The provisions of this chapter relating to the determination of paternity apply to a determination of maternity." *Id.* § 160.106.

Other state courts that have adopted the UPA have concluded that the marital presumption applies to non-gestational mothers in same-sex relationships. *See e.g., LC v. MG,* 430 P.3d 400, 409 (Haw. 2018) (holding that wife of a child's mother was presumed to be a legal parent of a child born during same-sex marriage pursuant to marital presumption under the UPA); *Partanen v. Gallagher*, 59 N.E.3d 1133, 1137 (Mass. 2016); *In re Guardianship of Madelyn B.*, 98 A.3d 494, 499 (N.H. 2014); *Frazier v. Goudschaal*, 295 P.3d 542, 547 (Kan. 2013) (holding the Kansas UPA allowed presumed parent status on same terms as presumed father); *Elisa B. v. Superior Court*, 117 P.3d 660, 665 (Cal. 2005) (holding that a woman was a presumed mother under the UPA provision presuming paternity based upon receiving the child into one's home and holding out child as one's own); *In re Parental Responsibilities of A.R.L.*, 318 P.3d 581, 584–85 (Colo. App. 2013) (interpreting the UPA to allow presumed mother under the same

7

circumstances as presumed father).

Since the trial court's rulings here, courts around the country have been addressing the issues that have arisen after *Obergefell.* 135 S.Ct. at 2607–08.[2] In *Pavan*, the United States Supreme Court held that an Arkansas statute that allowed the husband of a married woman whose child was conceived through assisted reproduction to be named on the child's birth certificate was unconstitutional because it excluded the name of the same-sex spouse when the child was conceived the same way. 137 S.Ct. at 2078; *see McLaughlin v. Jones*, 401 P.3d 492, 500 (Ariz. 2017) (recognizing expansion of paternity presumption was required under *Obergefell* to same-sex couple for child born during marriage).

We presume that, by enacting a statute the legislature intended compliance with the constitutions of this state and the United States. *See* TEX. GOV'T CODE ANN. § 311.021. We resolve all doubts in favor of a statute's constitutionality. *Id.*; *In re Allcat Claims Serv., L.P.*, 356 S.W.3d 455, 468 (Tex. 2011) (orig. proceeding); *Ex parte Groves*, 571 S.W.2d 888, 893 (Tex. Crim. App. 1978). In 2015, *Obergefell* decided that prohibition of same-sex marriage violated the federal constitution's guarantee of equal protection. 135 S.Ct. at 2607–08. In 2017, *Pavan* unequivocally extended *Obergefell*'s reach to ancillary benefits of marriage including such important, but mundane things as completing the names of the parents on the birth certificate of a child. *Pavan*, 137 S.Ct. at 2078 (citing

---

[2] There is an unpublished Texas case cited by neither party in their briefs, *In re A.E.*, No. 09-16-00019-CV, 2017 WL 1535101, at *10 (Tex. App.—Beaumont Apr. 27, 2017, pet. denied) (mem. op.), involving a same-sex married couple in which the Beaumont court rejected the non-gestational spouse's claim of maternity. That case was decided before *Pavan v. Smith,* 137 S. Ct. 2075, 2078 (2017). As a result, we consider that *Pavan* has established that our statutes must be read in a gender neutral fashion to comply with the Fourteenth Amendment and the constitutional guarantee of equal protection. *Id.*

135 S.Ct. at 2601). By interpreting § 160.106 and § 160.204(a)(1) together, we interpret the statute as written by the legislature, giving effect to all of the portions of the statute, and avoiding an interpretation that violates the equal protection guarantees of the Texas and federal constitutions. Accordingly, it follows that under *Pavan*, we are to give effect to the ancillary benefits of a same–sex marriage, including the determination of maternity for the non–gestational spouse of a child born to the marriage. *See* 137 S.Ct. at 2078.

### 2. Texas Policy

Here, we have a married couple whose situation with respect to determining the legal parentage of the child of their marriage is solely a result of their same-sex status. They were legally married, had a child during their marriage as a result of assisted reproduction, and divorced. Jennifer and Sandra both embraced that child as their own. Sandra testified that Jennifer was an intended parent and Jennifer testified that she participated in the child's insemination, in the events of the pregnancy, the birth, and taking care of the child once the child was born. Now, Jennifer argues that Texas statutes allow her to walk away from her marriage without any legal relationship with the child and without supporting the child of the marriage.

The Texas Supreme Court described the important function of child support in *Williams v. Patton*, its impact on the children of Texas, and the resulting Texas policy regarding enforcement.

> The function of child support is to help a custodial parent maintain an adequate standard of living for the child. When child support payments are not made, the result is a loss of funds available for the child's food, clothing, education, and home environment. It is a strong, long-standing policy of this state to protect the interests of its children, and this is the policy underlying the enforcement of child support obligations. Characterizing arrearages as

9

> nothing more than a "debt" owed to the custodial parent ignores the reality that the child is frequently the one who has been harmed by nonpayment and it is the child's interests which are ultimately sought to be protected.

821 S.W.2d 141, 145 (Tex. 1991).

Presently, Texas enforces child support against all parents through civil orders and criminal penalties. *See* TEX. FAM. CODE ANN. § 157.62 (enforcement by contempt); TEX. PENAL CODE ANN. § 25.05; *Harvill v. State*, 13 S.W.3d 478, 479 (Tex. App.—Corpus Christi–Edinburg 2000, no pet.). The former policy that allowed men who fathered children outside of marriage to escape support of their children was held to violate the equal protection clause. *See Gomez v. Perez*, 409 U.S. 535, 538 (1973); *Alvarado v. Gonzalez*, 552 S.W.2d 539 (Tex. App.—Corpus Christi–Edinburg 1977, no writ) ("The right of an illegitimate child to obtain support from his or her natural father has been recognized since the United States Supreme Court decision of *Gomez v. Perez*."). Texas policy changed to recognize that all children deserved to be supported by their parents.

### 3. Equal Protection

The Texas and United States Supreme Courts recognized years ago the importance of family and its protection under our federal constitution, especially the place of children:

> The Court has frequently emphasized the importance of the family. The rights to conceive and to raise one's children have been deemed "essential," "basic civil rights of man," and "(r)ights far more precious . . . than property rights." "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Ninth Amendment. (internal citations omitted.)

10

*In re G. M.*, 596 S.W.2d 846 (Tex. 1980) (quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)).

*Stanley* involved the unmarried father of children whose mother died. *See Stanley*, 405 U.S. at 646. Stanley's right to raise his children was unprotected by Illinois law because he had not married the children's mother. *Id.* Stanley was treated as a stranger to his children even though he had supported and cared for them*. Id.* at 647*.* The United States Supreme Court held that the Illinois law violated the equal protection clause. *Id.* at 658. The *G.M.* case addressed the standard of proof necessary for involuntary termination of parental rights and recognized the constitutional dimension of such deprivation. *In re G. M.*, 596 S.W.2d at 847.

More recently, the United States Supreme Court held that marriage between same-sex partners was guaranteed by the equal protection clause through the Fourteenth Amendment and that barriers to the full recognition of ancillary rights must be abandoned. *See Pavan*, 137 S.Ct. at 2078; *Obergefell*, 135 S.Ct. at 2608; *Strickland v. Day*, 239 So.3d 486, 488 (Miss. 2018) (reversing finding that child conceived through assisted reproduction during same-sex marriage was not child of non-gestational parent and remanding for further proceedings); *Garter v. Iowa Dep't of Pub. Health*, 830 N.W.2d 335, 352 (Iowa 2013) (holding that refusal of Department of Public Health to identify the spouse of married same-sex couple as parent of child conceived by assisted reproduction violated guarantees of equal protection).

The trial court gave effect to the Texas Family Code presumption that a child born of the marriage is the child of the mother's spouse pursuant to §§ 160.106 and

11

160.204(a)(1). The trial court treated this married couple like any other married couple who separated after having a child; it divided the community property, entered an order regarding the rights and responsibilities regarding the child including support, and granted the divorce requested by both. In doing so, the trial court did not abuse its discretion.

Accordingly, we overrule Jennifer's sole issue.

### III.    CONCLUSION

We affirm the trial court's judgment.

GINA M. BENAVIDES,
Justice

Delivered and filed the
23rd day of January, 2020.

12