**IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA**

**FILED**

**June 11, 2025**

ASHLEY N. DEEM, CHIEF DEPUTY CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

**IN RE: W.S., a minor,**

**No. 24-ICA-335**  (Fam. Ct. Mineral Cnty. Case No. FC-29-2016-FIG-28)

**MEMORANDUM DECISION**

Petitioner Tryston S.[1] appeals the August 8, 2024, order of the Family Court of Mineral County denying her petition to terminate Respondents Steven S. and Tina S.'s guardianship of W.S., a minor child. Respondents timely filed a response in support of the family court's decision. The guardian ad litem timely filed a summary response opposing the family court's decision and recommending termination of the guardianship. Tryston S. did not file a reply.[2]

This Court has jurisdiction over this appeal pursuant to West Virginia Code § 51-11-4 (2024). After considering the parties' oral arguments and briefs, the appendix record, and the applicable law, this Court finds error in the family court's decision, but no substantial question of law. Therefore, this case satisfies the "limited circumstances" requirement of Rule 21(d) of the Rules of Appellate Procedure, and a memorandum decision is appropriate to reverse the family court's order and to remand to the family court for the entry of an order consistent with this decision.

Tryston S. is the mother of W.S., born in 2014 and the minor child who is the subject of this appeal. Steven S. and Tina S. ("the Grandparents") are the child's paternal grandparents.[3] In 2016, the Grandparents initiated an action in the family court seeking guardianship of W.S., then two years old. *See* W. Va. Code § 44-10-3. At that time, Tryston

---

[1] Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.,* 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R., II,* 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.,* 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.,* 183 W. Va. 641, 398 S.E.2d 123 (1990); W. Va. R. App. P. 40(e).

[2] Petitioner is represented by Christopher D. Janelle, Esq. Respondents are represented by Max H. White, Esq. Lauren M. Wilson, Esq., is the child's court-appointed guardian ad litem.

[3] W.S.'s father, Garrett S., did not participate in the proceedings below or in this appeal. However, the record reflects that W.S. has contact with Garrett S. and his other children, W.S.'s half-siblings, when she is in the care of the Grandparents.

S. consented to the Grandparents' guardianship because she was struggling with addiction and facing drug-related criminal charges.[4] By order entered January 13, 2017, the family court granted the Grandparents' petition for guardianship and appointed them W.S.'s legal guardians.

It is undisputed that in the years since the court appointed the Grandparents guardians, Tryston S. has dramatically changed her life for the better. First, Tryston S. no longer uses illegal drugs. Further, she was released from probation in 2023, and at the time of the proceeding below, was gainfully employed, having recently received a promotion. Additionally, Tryston S. is now married, and she and her husband purchased a home in 2023. In 2024, they welcomed their first child together, W.S.'s half-sibling.

Over the years, as Tryston S. improved her life and living situation, she sought to terminate the Grandparents' guardianship and regain custody of W.S. She filed her first action to terminate the guardianship in August 2020. While the family court denied her request, the court granted Tryston S. visitation with W.S. In December 2022, Tryston S. filed her second action to terminate the Grandparents' guardianship; the family court again denied her request, but granted her even more parenting time with W.S., ordering the parties to follow a 50-50 shared visitation schedule. Despite this, the family court left all decision-making authority for W.S. with the Grandparents.

Once the family court granted Tryston S. 50-50 visitation, she had the ability to take a more active role in W.S.'s life. Tryston S. became more involved in W.S.'s education, retained a tutor to assist W.S. in her studies, supported W.S. in extracurricular activities, and arranged her participation in summer camps. Nevertheless, Tryston S. and the Grandparents have a strained relationship, and, unfortunately, W.S. is well aware of the same. The guardian ad litem asserts that the parties' poor relationship causes W.S. significant stress.

After following the 50-50 visitation schedule for nearly a year, on January 12, 2024, Tryston S. again moved the family court to terminate the Grandparents' guardianship, arguing that she was a fit parent and able to provide permanency and stability for her child. Additionally, Tryston S. alleged that the Grandparents repeatedly made significant medical decisions for W.S. without her advice, consent, approval, or knowledge, which the Grandparents admitted. Tryston S. also asserted the Grandparents "persistently" denied her access to the W.S.'s medical and educational records, and the Grandparents admitted doing this, as well. Tryston S. further argued that the Grandparents disparaged her to W.S. and that the Grandparents' actions were detrimental to W.S. The Grandparents filed a response opposing Tryston S.'s motion, but, in the alternative, filed a "motion for custodial allocation as a psychological parent/motion for grandparent visitation." The Grandparents also argued that it would be in W.S.'s best interest for the guardianship and the current 50-50 visitation

---

[4] The record is silent as to whether Garrett S. consented to the guardianship.

schedule to remain in effect. Further, the Grandparents alleged that W.S. wants to continue following the 50-50 schedule, and as things are going well, change is unnecessary.

The family court ordered the guardian ad litem to investigate and to make a recommendation as to whether the Grandparents' guardianship should continue.[5] Based upon her investigation, the guardian ad litem recommended that the court terminate the guardianship because it was no longer needed, and explained that it would be in W.S.'s best interests to be returned to Tryston S.'s custody.[6] In her report, the guardian ad litem explained that Tryston S. had done "absolutely everything possible to remedy the circumstances that led to the initial guardianship" and noted that she could not "think of anything more that [Tryston S.] could do to put herself in a better position." The guardian ad litem further explained in her report that W.S. lacks consistency in her life because of the guardianship and that terminating the same would give her the needed consistency. However, the guardian ad litem recommended W.S. gradually transition to living full-time with Tryston S. by first increasing Tryston S.'s visitation time from 50-50 to 70-30 for a period of time. Importantly, the guardian ad litem also recommended that the Grandparents receive regular visitation with W.S. Further, the guardian ad litem recommended that, if Tryston S. were unable to provide care for W.S. for any extended period of time, the Grandparents be permitted to care for her.

At the hearing on Tryston S.'s motion to terminate guardianship, the family court heard testimony from a number of witnesses, including the guardian ad litem and Kim Mullaney, W.S.'s private counselor. The guardian ad litem testified regarding her investigation, report, and recommendation. The guardian ad litem reiterated her concerns about the lack of consistency in W.S.'s life, noting that in 2023, a doctor expressed similar concerns. Further, as stated in her report, the guardian ad litem explained that this lack of consistency resulted from Tryston S. and the Grandparents providing W.S. different homelife structures and setting different expectations for her.[7] Moreover, the guardian ad litem testified about her concerns over W.S. being tardy to school twenty-three times during the 2023-2024 school year, all but three of which occurred while W.S. was in the

---

[5] The family court appointed the guardian ad litem several years before the 2024 action. Therefore, at the time of her 2024 appointment, the guardian ad litem was already familiar with the child, the parties, and the issues of the case.

[6] We note that none of the parties take issue with the quality or thoroughness of the guardian ad litem's investigation.

[7] This doctor performed a neuropsychological evaluation on W.S. and recommended that W.S. sleep in her own room while at both homes to increase consistency between the households. Notably, Tryston S. has followed the doctor's recommendation; the Grandparents have not.

Grandparents' care.[8] The guardian ad litem further explained that the poor relationship between Tryston S. and the Grandparents causes W.S. significant stress, which both W.S.'s teacher and Kim Mullaney noted when she spoke to them, and that terminating the guardianship would be in W.S.'s best interest because it would ensure more consistency in W.S.'s life and reduce the stress caused by her exposure to this discord.

However, in both her report and in her testimony, the guardian ad litem advised the court that W.S., then nearly ten years old, wanted to continue following the 50-50 schedule for various reasons, such as she was used to it and because of her unfounded fear that if she lived with Tryston S. full-time, she would never see Grandmother again. Also, the guardian ad litem explained that W.S. expressed concerns over not being allowed to take certain toys with her from the Grandparents' house or to continue taking riding lessons.[9] W.S. did not explain to the guardian ad litem why she believed such things. However, as stated in the guardian ad litem's report, when the guardian ad litem suggested to W.S. that Tryston S. could take her to riding lessons, W.S. replied that Tryston S. could not because the lessons took place on "private property." Again, W.S. provided no explanation for this belief. The guardian ad litem further advised that W.S. wanted the 50-50 schedule to remain in effect because she did not want to change schools, and the possibility of having to change schools appeared to cause W.S. anxiety.[10]

Conversely, Kim Mullaney provided a letter to the court opposing the termination of the guardianship, and testified to that effect at the hearing.[11] In both her testimony and in her letter, Ms. Mullaney opined that terminating the guardianship *could* harm W.S., amplify her abandonment issues, and increase her separation anxiety with respect to the Grandmother. However, Ms. Mullaney did not state that terminating the guardianship *would* harm W.S. During her testimony, Ms. Mullaney, however, conceded that if the court were to terminate the guardianship, it would be better for W.S. to slowly and gradually transition to living with Tryston S., such as by first following a 60-40 or 70-30 visitation schedule for a period of time.

---

[8] The Grandparents contend that they usually have W.S. at school on time, just not at her classroom. They claim that W.S. is tardy because she often gets upset at drop-off over not wanting to leave the Grandmother, and the Grandmother does not want to leave W.S. while she is upset.

[9] The parties appear to agree that the child's fears are unfounded; however, it is unknown why the child harbors these beliefs.

[10] The record reflects that the Grandparents pay for W.S. to attend a private school.

[11] Ms. Mullaney testified that the Grandmother first brought W.S. to her for counseling services in 2022.

4

By order entered August 8, 2024, the family court found that Tryston S. proved a material change in circumstances had occurred, but that she failed to prove that termination of the guardianship was in W.S.'s best interest. As such, the family court denied Tryston S.'s motion to terminate the guardianship and ordered the parties to continue following the 50-50 visitation schedule. However, the family court granted Tryston S. shared decision-making authority with the Grandparents. The court summarily dismissed the Grandparents' motion for custodial allocation as a psychological parent/motion for grandparent visitation as moot. It is from this order that Tryston S. now appeals.

We apply the following standard of review when reviewing an order of a family court:

> When a final order of a family court is appealed to the Intermediate Court of Appeals of West Virginia, the Intermediate Court of Appeals shall review the findings of fact made by the family court for clear error, and the family court's application of law to the facts for an abuse of discretion. The Intermediate Court of Appeals shall review questions of law de novo.

Syl. Pt. 2, *Christopher P. v. Amanda C.,* 250 W. Va. 53, 902 S.E.2d 185 (2024); *accord* W. Va. Code § 51-2A-14(c) (2005) (specifying standards for appellate review of family court orders).

"Questions relating to . . . the maintenance and custody of the children are within the sound discretion of the court and its action with respect to such matters will not be disturbed on appeal unless it clearly appears that such discretion has been abused." Syl., *Nichols v. Nichols,* 160 W. Va. 514, 236 S.E.2d 36 (1977). An appellate court may reverse for abuse of discretion if "a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed but the [lower court] makes a serious mistake in weighing them." *Gentry v. Mangum,* 195 W. Va. 512, 520 n.6, 466 S.E.2d 171, 179 n.6 (1995). Thus, an appellate court "will not simply rubber stamp the trial court's decision when reviewing for an abuse of discretion[.]" *State v. Hedrick,* 204 W. Va. 547, 553, 514 S.E.2d 397, 403 (1999). With these standards in mind, we now consider the issues on appeal.

At the outset of our discussion, we note that the parties do not dispute Tryston S.'s fitness as a parent. On appeal, Tryston S. argues that the family court erred by finding that she failed to prove terminating the guardianship was in the best interest of W.S. and by failing to afford her "special weight" as a fit parent in reaching its decision. She contends that by doing so, the family court ignored her fundamental right to rear and to make decisions for her child, pursuant to *Troxel v. Granville,* 530 U.S. 57 (2000), *In re K.H.,* 235 W. Va. 254, 773 S.E.2d 20 (2015), and *In re Clifford K.,* 217 W. Va. 625, 619 S.E.2d 138 (2005). We agree.

We begin our analysis by examining the law controlling the guardianship of minors, which, in West Virginia, is statutory. *See* Syl. Pt. 5, in part, *In re Antonio R.A.*, 228 W. Va. 380, 719 S.E.2d 850 (2011) ("A family or circuit court's authority to appoint a suitable person as a guardian for a minor . . . is derived from West Virginia Code § 44-10-3[.]"). West Virginia Code § 44-10-3 states, in part, the following:

> (i) The court, the guardian or the minor may revoke or terminate the guardianship appointment when . . . (4) A petition is filed by . . . a parent . . . stating that the minor is no longer in need of the assistance or protection of a guardian due to changed circumstances and the termination of the guardianship would be in the minor's best interest.

> (j) For a petition to revoke or terminate a guardianship filed by a parent, the burden of proof is on the moving party to show by a preponderance of the evidence that there has been a material change of circumstances and that a revocation or termination is in the child's best interest . . . .

W. Va. Code § 44-10-3(i)(4)-(j) (2013). Therefore, to prevail below on her motion to terminate the Grandparents' guardianship, Tryston S. was required to prove two elements by a preponderance of the evidence: that there had been a material change of circumstances, and that terminating the guardianship was in W.S.'s best interest.[12]

As to the first element, the family court found that Tryston S. proved a material change of circumstances, and the Grandparents did not appeal any portion of the family court's order; therefore, it is unnecessary for this Court to address that issue on appeal. We note that the Grandparents offer a cursory argument that Tryston S. failed to prove a material change in circumstances below, but they fail to support their argument with citations to the record. *See* W. Va. R. App. P. Rule 10(c)(7) ("The Intermediate Court . . . may disregard errors that are not adequately supported by specific references to the record on appeal.").

Regarding the second element, the "best interest of the child," the SCAWV has explained that,

> [f]or a century-and-a-half, the courts of this State have been guided by the fundamental rule that, when addressing custody issues involving children, the best interests of the child trump all other considerations. It is the polar star that steers all discretion. As we said in 1925, "we must not lose sight of

---

[12] The SCAWV has recognized that "'[p]reponderance of the evidence' is defined as that degree of evidence that is of greater weight or more convincing than the evidence which is offered in opposition to it; that is, evidence which as a whole shows the fact to be proved to be more probable than not." *Frazier v. Gaither,* 248 W. Va. 420, 425, 888 S.E.2d 920, 925 (2023) (quoting *Suhr v. Okorn,* 83 S.W.3d 119, 121 (Mo. Ct. App. 2002)).

the rule that obtains in most jurisdictions at the present day, that the welfare of the child is to be regarded more than the technical legal rights of the parent." *Connor v. Harris,* 100 W.Va. 313, 317, 130 S.E. 281, 283 (1925).

*Brooke B. v. Ray*, 230 W. Va. 355, 361, 738 S.E.2d 21, 27 (2013) (footnote omitted). Therefore, to determine the "best interest of a child," we must look at the child's welfare. The West Virginia Legislature has instructed that the best interests of the child may be facilitated by ensuring (1) stability, (2) collaborative parenting and agreement about the child's upbringing, (3) continuity of existing parent-child attachments, (4) meaningful contact between a child and each parent, (5) caretaking and parenting relationships by adults who love the child, know how to provide for the child's needs, and place a high priority on doing so, (6) security from exposure to physical or emotional harm, (7) expeditious, predictable decision-making and avoidance of prolonged uncertainty respecting arrangements for the child's care and control, and (8) meaningful contact between a child and siblings, including half-siblings. *See* W. Va. Code § 48-9-102(a) (2022). *See also In re Clifford K.,* 217 W. Va. 625, 619 S.E.2d 138 (2005).

However, "there is a presumption that fit parents act in the best interests of their children." *Lindsie D.L. v. Richard W.S.*, 214 W. Va. 750, 755, 591 S.E.2d 308, 313 (2003). Furthermore, "[w]hile courts always look to the best interests of the child in controversies concerning . . . custody, such custody should not be denied to a parent merely because some other person might possibly furnish the child a better home or better care." Syl. Pt. 4, *Terrence E. v. Christopher R.,* 243 W. Va. 202, 842 S.E.2d 755 (2020) (quoting Syl. Pt. 3, *Hammack v. Wise,* 158 W. Va. 343, 211 S.E.2d 118 (1975)). *See also In re Haylea G.,* 231 W. Va. 494, 745 S.E.2d 532 (2013).

With this legal framework in mind, we first turn to Tryston S.'s argument that she met her statutory burden of proving that terminating the Grandparents' guardianship was in the best interest of W.S. In its final order on appeal, the family court correctly acknowledged that "parents have substantial rights," but explained that W.S. "is entitled to stability in her life," and "finding the right balance between [Tryston S.'s] right to parent her child and the child's best interests is a crucial task." However, the order reflects that the court, in large part, based its decision on Ms. Mullaney's opinion, stating that "termination of the guardianship *could* irreparably harm the child and amplify her abandonment issues and exacerbate her separation anxiety, from [the Grandmother]" (emphasis added).[13] We find it significant that the family court made no finding that terminating the guardianship *would* cause any such harm. Further, the court failed to explain what this irreparable harm would be or why the harm would be irreparable. Thus, the court based its decision on nothing more than a vague, conclusory statement. We

---

[13] The SCAWV has consistently held that "[i]t is a paramount principle of jurisprudence that a court speaks only through its orders." *Legg v. Felinton*, 219 W. Va. 478, 483, 637 S.E.2d 576, 581 (2006) (citations omitted).

acknowledge that the parties have not suggested that W.S. cease counseling with Ms. Mullaney. Moreover, as to tardiness, the record demonstrates that Ms. Mullaney and W.S.'s school counselor were unaware of W.S.'s tardiness issues until the guardian ad litem asked them about W.S.'s twenty-three tardies. Yet, despite the guardian ad litem's experience with the case and the parties and her unquestionably thorough investigation, the court rejected her recommendation without explanation.

Further, the record reflects that the family court based its decision, at least in part, on the fact that W.S. wanted to continue to follow the 50-50 visitation schedule. This is problematic because, as the guardian ad litem explained, W.S. based her position largely on her unfounded fears of never seeing Grandmother again and her concerns about having access to her toys, riding lessons, and her school preference. However, W.S.'s stated concerns remind us that W.S. was just under ten years old when she expressed her preference and not yet mature enough to make such important decisions for herself. *See* W. Va. Code § 48-9-402.

However, the family court did not consider the possibility that it could be in W.S.'s best interest to be returned to Tryston S., an undisputably fit parent, and to fully share in the new life Tryston S. has built, including having the opportunity to develop a relationship with her new half-sibling. Developing relationships with siblings, including half-siblings, is another factor considered to facilitate a child's best interest. *See* W. Va. Code § 48-9-102(a)(8). W.S. has had the opportunity to develop relationships with her half-siblings on her father's side of the family, while residing with the Grandparents.[14] Also, the court did not consider whether the guardianship was still necessary, in light of the material changes in circumstances it specifically found that Tryston S. proved. The circumstances that led to the guardianship in 2017 no longer exist. Moreover, Tryston S. has consistently maintained that she favors W.S. continuing to have regular visitation with the Grandparents. At no time has Tryston S. indicated a desire to cut the Grandparents out of W.S.'s life. Accordingly, we find that the family court abused its discretion in finding that Tryston S. failed to prove that terminating the Grandparents' guardianship would be in the best interest of the child.

We further find that the family court failed to afford Tryston S. the requisite special weight as W.S.'s mother in rendering its decision to continue the guardianship. The United States Supreme Court stated the following in *Troxel v. Granville,* 530 U.S. 57 (2000):

> The interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court . . . The "liberty" protected by the Due Process Clause includes the right of parents to establish a home and bring up children and to control the education of their own . . . The liberty of parents and guardians includes the

---

[14] The guardian ad litem noted in her report that both the Grandparents and W.S. mentioned W.S.'s two half-siblings visiting while W.S. was at the Grandparents' home.

right to direct the upbringing and education of children under their control . . . The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations . . . It is cardinal with us that the custody, care, and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.

*Id.* at 65-66 (cleaned up). Similarly, the Supreme Court of Appeals of West Virginia ("SCAWV") has held that,

Nothing is more sacred or scrupulously safeguarded as a parent's right to the custody of his/her child. In the law concerning custody of minor children, no rule is more firmly established that that the right of a natural parent to the custody of his or her infant child is paramount to that of any other person; it is a fundamental personal liberty protected and guaranteed by the Due Process Clauses of the West Virginia and United States Constitutions.

*In re Clifford K.,* 217 W. Va. 625, 644, 619 S.E.2d 138, 157 (2005). *See also* Syl. Pt. 1, *In re Willis,* 157 W. Va. 225, 207 S.E.2d 129 (1973).

Nevertheless, the SCAWV has also made clear that "[s]uperior to any rights of parents to the custody of their own children, however, is the overriding consideration of the child's best interests. Thus, the natural right of parents to the custody of their children is always tempered with the courts' overriding concern for the well-being of the children involved." *Kessel v. Leavitt*, 204 W. Va. 95, 174, 511 S.E.2d 720, 799 (1998). *See also* Syl. Pt. 3, in part, *In re Katie S.,* 198 W. Va. 79, 479 S.E.2d 589 (1996) ("Although parents have substantial rights that must be protected, the primary goal . . . in all family law matters . . . must be the health and welfare of the children."); Syl. Pt. 5, *Carter v. Carter,* 196 W. Va. 239, 470 S.E.2d 193 (1996) ("In visitation as well as custody matters, we have traditionally held paramount the best interests of the child."); Syl. Pt. 7, *In re Brian D.,* 194 W. Va. 623, 461 S.E.2d 129 (1995) ("Cases involving children must be decided not just in the context of competing sets of adults' rights, but also with a regard for the rights of the child(ren)."); *Green v. Campbell,* 35 W. Va. 698, 702, 14 S.E. 212, 214 (1891) ("[T]he welfare of the infant is the polar star by which the court is to be guided in the exercise of its discretion; and the court . . . is not bound by any mere legal right of parent or guardian, but is to give it due weight as a claim founded on human nature, and generally equitable and just.").

As the SCAWV recognized in *In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015), we understand that striking a balance between a biological parent's constitutional rights and a child's best interests is challenging. Similar to the case before us, *In re K.H.* also involved a grandparent's guardianship of a minor child. There, the family court granted the maternal grandmother guardianship of her one-year-old granddaughter soon after the death of the

child's mother, grandmother's own daughter. The child's father had first seen the child only about a month before the mother died, but he appeared at the guardianship hearing and did not object to the court appointing the grandmother the child's guardian. In the years that followed, the father sought and obtained regular parenting time with the child, which the court also gradually increased. Eventually, the father filed a petition to terminate the guardianship, which the grandmother opposed, and the grandmother moved the court to designate her the child's psychological parent.

As in the instant matter, in *In re: K.H.*, the family court appointed the child a guardian ad litem to investigate and to make a recommendation as to whether terminating the guardianship would be in the child's best interest. The guardian ad litem reported to the court that the father could provide a stable environment for the child, and, as such, the child no longer needed the guardianship and that granting the father custody would be in the best interest of the child. Based upon the evidence presented, including a psychologist's testimony that the grandmother and child shared a significant bond, and the child thought of the grandmother as her mother, the family court terminated grandmother's guardianship and denied the grandmother's motion to be designated the child's psychological parent. The circuit court affirmed the family court's rulings.

On appeal, the SCAWV affirmed the family court's decision, concluding that the family court had properly terminated the guardianship, noting, "[t]he court . . . recognized the immeasurable importance of the child's best interests" and "[t]he [family] court explained that the 'record clearly reflects that throughout the years Father has continually stepped up to care for his child and has willingly assumed additional and substantial parental responsibilities as well as all caretaking functions for his minor daughter.'" 235 W. Va. at 258, 773 S.E.2d at 24. The SCAWV further found that the family court satisfactorily considered K.H.'s best interest, the change in circumstances (the father increasing his level of participation in the child's life over the years), and the advice and conclusions of the guardian ad litem in reaching its decision.

Yet, the *In re: K.H.* Court found that the family court erred in denying the grandmother's motion to be designated the child's psychological parent and remanded the matter for the entry of an order "specifying a liberal visitation schedule to permit significant and meaningful opportunity for the grandmother to interact with K.H.," noting that "[t]ransitions in the life of a child should be fashioned in a manner which minimizes the trauma to the child." *Id.* at 266, 773 S.E.2d at 32.

Notably, in *In re K.H.*, the SCAWV discussed *Troxel* in detail, and required that courts give "special weight" to a parent's assessment of his or her child's best interests, stating as follows:

In *Troxel,* the United States Supreme Court held that awarding visitation to a non-parent, over the objections of a parent, is subject to constitutional

limitations. The Court in *Troxel* invalidated a Washington statute authorizing "any person" to petition for visitation rights "at any time[,]" and described the statute as "breathtakingly broad." [530 U.S.] at 67. This Court has examined the *Troxel* case, noting that it "instructs that a judicial determination regarding whether grandparent visitation rights are appropriate may not be premised *solely* on the best interests of the child analysis." *Cathy L.M. v. Mark Brent R.,* 217 W. Va. 319, 327–28, 617 S.E.2d 866, 874–75 (2005) (emphasis supplied). Instead, this Court emphasized in *Cathy L.M.* that the evaluating court "must also consider and give significant weight to the parents' preference, thus precluding a court from intervening in a fit parent's decision making on a best interests basis." *Id.* That is the gravamen of the *Troxel* decision; the true failing of the Washington statute in *Troxel* was "not that the [trial court] intervened, but that when it did so, it gave no special weight at all to [the parent's] determination of her daughters' best interests." 530 U.S. at 69.

*Id.* at 263-64, 773 S.E.2d at 29-30. Moreover, the SCAWV has discussed the meaning of the phrase "special weight" used in *Troxel*:

> Although *Troxel* does not define "special weight," state courts attempting to interpret and apply *Troxel* have reasoned that "special weight" indicates considerable deference. In *In re M.W.,* 292 P.3d 1158 (Colo.App.2012), for instance, the Colorado Court of Appeals explained that "[g]iving special weight means that the presumption favoring the parent's decision can be rebutted only by clear and convincing evidence that granting parental responsibilities to the nonparent is in the child's best interests." *Id.* at 1161.

*In re Visitation of A.P.,* 231 W. Va. 38, 42 n.7, 743 S.E.2d 346, 350 n.7 (2013).

The SCAWV also considered the balance between a parent's fundamental rights and the best interest of the child in *Honaker v. Burnside,* 182 W. Va. 448, 388 S.E.2d 322 (1989), which involved a fit biological father seeking custody of his daughter following the death of the child's mother. In *Honaker*, the child had lived with her mother, stepfather, and half-sibling from an early age until the mother's death, at which time the stepfather was appointed her guardian pursuant to the mother's will. The father sought to terminate the guardianship and to be granted custody of his daughter, arguing that "an unoffending natural parent should be entitled to custody of his or her child if such parent has not abandoned such child nor has in any manner been proven unfit." *Id.* at 450, 388 S.E.2d at 324. The circuit court agreed, terminated the guardianship, and granted custody of the child to the father. On appeal, the *Honaker* Court affirmed the decision of the circuit court, acknowledging that the child's best interest "is of immeasurable importance" but recognized the right of biological parents to raise their own children. *Id.* at 451, 388 S.E.2d at 324. Importantly, the Court required that the child gradually transition to residing full-

11

time with the father because the child had lived with the stepfather and half-sibling for so long.

*In re K.H.* and the instant matter share a number of similarities, such as long-term grandparent guardianships and fit parents who, over time, increased their parenting time with their children, continued to step up to provide more care for their children, and assumed additional parenting responsibilities, as permitted by courts. However, unlike Tryston S., the father in *In re K.H.* did not even know the child when the guardianship began, but within a year he sought and received parenting time with the child, which only increased over the years. Ultimately, the court found that the guardianship was no longer needed because the father could provide the child a stable life. Accordingly, the court terminated the guardianship and granted the father custody of the child.

In this matter, years ago, Tryston S. recognized that given her struggle with addiction and her circumstances, it was in the best interest of W.S. to be with the Grandparents and consented to their guardianship appointment. However, as Tryston S. improved her life, she immediately began trying to regain custody of her child. Even though the court denied her requests, each time it granted her more parenting time with W.S., to the point where W.S. now lives, and has for over a year lived, with Tryston S. half of the time. The fact that the family court has entrusted Tryston S. with the care of her child fifty percent of the time demonstrates that the court perceives no danger in the child residing in Tryston S.'s home. Further, as in *In re K.H.*, in the order on appeal, the family court explicitly found that Tryston S. was a stable caretaker for W.S.

Based upon our review, we find that the family court abused its discretion by finding that Tryston S. failed to prove that terminating the guardianship would be in the best interest of W.S. and by failing to afford Tryston S. the special weight she was due as W.S.'s mother in rendering its decision. Therefore, we find that the family court erred by denying Tryston S.'s motion to terminate the Grandparents' guardianship. Accordingly, we reverse the August 8, 2024, order of the family court and remand this case for the entry of an order consistent with this decision.

Reversed and Remanded.

**ISSUED:** June 11, 2025

**CONCURRED IN BY:**

Chief Judge Charles O. Lorensen
Judge Daniel W. Greear
Judge S. Ryan White

GREEAR, J., concurring:

12

I concur with the majority's opinion. I write separately to highlight the importance of the acknowledgement and consideration of the fundamental rights of fit parents, like Tryston S., to the custody of their minor children. The Supreme Court of Appeals of West Virginia ("SCAWV") has long recognized the fundamental rights of fit parents and has adopted the "presumption that fit parents act in the best interests of their children." Syl. Pt. 4, *Lindsie D.L. v. Richard W.S.*, 214 W. Va. 750, 591 S.E.2d 308 (2003). In its recent decision, *In re I.S.*, No. 23-332, 2024 WL 4788059, at *7–8 (W. Va. Nov. 14, 2024) (memorandum decision), the SCAWV reasoned that

> In the law concerning custody of minor children, no rule is more firmly established than that the right of a natural parent to the custody of his or her infant child is paramount to that of any other person; it is a fundamental personal liberty protected and guaranteed by the Due Process Clauses of the West Virginia and United States Constitutions.

> Syl. Pt. 1, *In re Willis*, 157 W. Va. 225, 207 S.E.2d 129 (1973).

> *        *        *

> The Due Process Clauses of Article III, Section 10 of the Constitution of West Virginia and of the Fourteenth Amendment of the Constitution of the United States protect the fundamental right of parents to make decisions concerning the care, custody, and control of their children.

Syl. Pt. 3, *Lindsie D.L. v. Richard W.S.*, 214 W. Va. 750, 591 S.E.2d 308 (2003). Consequently, "there is a presumption that fit parents act in the best interests of their children." *Id.* at 751, 591 S.E.2d at 309, syl. pt. 4. Moreover,

> [in] light of the fundamental liberty interest that parents have in the care of their children, governmental intrusion into the family is warranted only in exceptional circumstances. The statutory bases for court interference with the parents' right to custody and control of their children are limited and specific. *See e.g.*, W.Va.Code § 48-9-206 [(2022)] (custody and visitation rights between parents in a divorce); W.Va.Code § 48-10-301 [(2006)] (grandparents' visitation); W.Va.Code § [49-4-705 (2024)] (taking a juvenile offender into custody before adjudication in certain enumerated circumstances);

13

> W.Va.Code § [49-4-602 (2015)] (taking an allegedly neglected
> and/or abused child into temporary custody); W.Va.Code §
> [61-8D-10 (2016)] (care of child upon parent's conviction for
> contributing to the child's delinquency) and W.Va.Code § [49-
> 4-604(c)(6) (2020)] (termination of parental rights when child
> has been adjudicated neglected and/or abused).

*Lindsie D.L.,* 214 W. Va. at 755, n.5, 591 S.E.2d at 313, n.5.

Here, in the instant case, there was no presumption made by the family court that Tryston S., as the fit parent of W.S., would act in W.S.'s best interest. Further, the court did not afford any weight to the fact that Tryston S. was the fit parent of W.S., let alone "special weight" required by the United States Supreme Court in *Troxel v. Granville,* 530 U.S. 57, 65-67 (2000). While, like the family court below, I acknowledge the difficulty in tempering the fundamental rights of fit parents and the best interests of the child, in the underlying case, based upon a review of the record, the family court simply got it wrong.

As noted by the guardian ad litem, the person directed by the court to complete an investigation of the necessity of the continuation of the guardianship, Tryston S. has done "absolutely everything possible to remedy the circumstances that led to the initial guardianship" and the guardian noted that she could not "think of anything more that [Tryston S.] could do to put herself in a better position." Notably, Tryston S. has become more involved in W.S.'s education, retained a tutor for W.S., supported W.S. in her participation of extracurricular activities, and arranged for W.S. to attend a summer camp. Moreover, the guardian reported that she had concerns about the lack of consistency in W.S.'s life (citing different homelife scenarios with differing expectations of W.S. at her two residences), and referred to a 2023 report wherein a doctor expressed similar concerns. However, rather than rely upon the findings of the appointed guardian ad litem, the family court instead relied upon the vague assertions of a counselor, who did not address the issue of W.S.'s need for consistency between her home with Tryston S. and her home with her grandparents – an issue of great importance to the best interests of W.S.

I applaud the willingness of the grandparents of W.S. to be her guardians and offer her a stable and loving home. Likewise, I applaud the efforts of parents like Tryston S. who change their lives and circumstances for the betterment of themselves and their children. The precedent of this Court and the United States Supreme Court requires that Tryston S. be given the presumption that fit parents act in the best interest of their children and the fact that she is a fit parent be given special weight in determination of custody. The court below gave no such presumption and considerations to Tryston S., despite finding no issue with Tryston S.'s parental fitness by allowing her 50-50 custody of W.S.

For the foregoing reasons, I respectfully concur.

14